UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/22/2014
```

-------------------------------------------------------------------X

BENIHANA OF TOKYO, LLC, as successor to
BENIHANA OF TOKYO, INC.,

                      Plaintiff,

          -v-

BENIHANA INC., as successor to BENIHANA
NATIONAL CORP.; NOODLE TIME, Inc.,

                Defendants.

-------------------------------------------------------------------X

14 Civ. 224 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This is the third lawsuit the Court has heard within the last year between these two

Benihana entities. The parties are currently arbitrating their dispute over the termination, by

defendant Benihana, Inc. ("Benihana America"), of a license held by plaintiff Benihana of

Tokyo, LLC ("Benihana of Tokyo"), to operate a Benihana restaurant in Hawaii.[1]

      In this action, Benihana of Tokyo seeks a declaratory judgment that certain statements on

its website, most of which are unrelated to the Hawaii restaurant, do not violate Benihana

America's rights under the Lanham Act, 15 U.S.C. § 1125. Benihana America has responded

with counterclaims for trademark infringement, false designation of origin, unfair competition,

deceptive trade practices, trademark dilution, and breach of contract. Benihana of Tokyo has

now filed the instant motions to compel arbitration of its adversary's counterclaims and to

---

[1] For ease of reference, the Court refers to Benihana, Inc. as "Benihana America." Benihana, Inc. has the right to operate Benihana restaurants in Central America, South America, and the islands of the Caribbean Sea, as well as in the United States of America. *See* Dkt. 1 Ex. ARA §§ 1.01(d), 7.10.

dismiss its own claim for declaratory judgment.  Benihana of Tokyo argues that the counterclaims are subject to arbitration by virtue of the arbitration clause in Section 13.2 of the License Agreement pertaining to the Hawaii restaurant.  Benihana America counters that (1) Section 13.2 does not provide for mandatory arbitration, but only for arbitration on consent, and, (2) in any event, Section 13.2 does not encompass its counterclaims.

For the reasons that follow, the Court holds that Section 13.2 of the License Agreement does provide for compulsory arbitration as to the disputes it reaches.  However, the Court holds, Section 13.2 reaches only a small portion of the counterclaims brought here by Benihana America.  Specifically, it reaches the counterclaims, or portions thereof, that arise out of activities in Hawaii.  Importantly—with one very small exception—none of Benihana America's counterclaims (or portions thereof) that arise out of statements on Benihana of Tokyo's website come within Section 13.2.  Accordingly, Benihana of Tokyo's motion to compel arbitration of the counterclaims brought by Benihana America is granted in small part and denied in large part.  Benihana of Tokyo's motion to dismiss its own claim for declaratory relief is denied, but without prejudice to Benihana of Tokyo's right to so move again after taking into account this decision.

## I.    Background

### A.  The Initial Agreement Between the Parties

Contrary to what some consumers may assume, there are two distinct corporations that operate the iconic Benihana restaurants.  These two entities, Benihana America and Benihana of Tokyo, divided worldwide rights to operate such restaurants in an agreement executed on December 29, 1994.  *See* Dkt. 1 ("Compl.") Ex. A ("Amended and Restated Agreement and Plan of Reorganization" or "ARA") (as amended March 17, 1995).  The ARA gave Benihana America the right to operate Benihana restaurants and use the Benihana trademarks in the United

States, Central America, South America, and the islands of the Caribbean Sea, which the ARA refers to collectively as the "Territory."  ARA §§ 1.01(d), 7.10.  It gave Benihana of Tokyo the right to operate Benihana restaurants and use the Benihana trademarks outside of the Territory. *Id.*  The ARA also contemplated that Benihana America would grant Benihana of Tokyo a license to continue to operate a pre-existing Benihana restaurant in Hawaii and to use the Benihana trademarks in connection with the operation of that restaurant.  *Id.* § 8.02(d).  The ARA does not contain any arbitration provisions.

### B.    The License Agreement Concerning the Hawaii Restaurant

On May 15, 1995, as contemplated by the ARA, Benihana of Tokyo and Benihana America entered into a License Agreement concerning the Hawaii restaurant.  Dkt. 7 ("Answer") Ex. 1 ("Hawaii License Agreement" or "License Agreement" or "Agreement").  Specifically, Article 1 of the License Agreement provides that:

> 1.1    Licensor [Benihana America'] hereby grants to Licensee [Benihana of Tokyo], subject to the terms and conditions herein contained, the right, license and franchise to establish and operate Benihana of Tokyo restaurants (collectively, the "Restaurants" and individually, a "Restaurant"), in the State of Hawaii outside the 15-mile radius around the Benihana of Tokyo restaurant presently located in Kaanapali-Lahaina, Maui, Hawaii (the "Territory") . . . and to use solely in connection therewith the System,[2] including the Marks[3] as they may be changed,

---

[2] The License Agreement defines the "System" as "a unique and distinctive system of high-quality restaurants known as 'Benihana of Tokyo.'"  License Agreement at 1.

[3] The License Agreement defines the "Marks" as

> all proprietary and other property rights and interests in and to certain trade names, service marks, trade marks, logos, emblems and indicia of origin, including but not limited to the marks "Benihana[,]" "Benihana of Tokyo" and the "flower" symbol, and such other trade names, service marks and trade marks as Licensor may develop in the future for the purpose of identifying the System.

License Agreement at 1.  It also provides that Benihana America is the "sole and exclusive owner" of the Marks.  *Id.*

improved and further developed from time to time, in accordance with the terms and conditions of this Agreement.

License Agreement § 1.1.

The License Agreement sets out the terms under which Benihana of Tokyo is to operate the restaurant. These govern such matters as the composition of the menu and the use of the Benihana trademarks in Hawaii. Relevant here, Article 13 contains two arbitration provisions:

<u>ARBITRATION</u>

13.1   If this Agreement shall be terminated by Licensor and Licensee shall dispute Licensor's right of termination, or the reasonableness thereof, the dispute shall be settled by arbitration at the main office of the American Arbitration Association in the City of New York in accordance with the rules of said association and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitration panel shall consist of three (3) members, one (1) of whom shall be chosen by Licensor, and (1) by Licensee and the other by the two (2) so chosen.

13.2   In the event any other dispute arises between the parties hereto in connection with the terms or provisions of this Agreement, either party by written notice to the other party may elect to submit the dispute to binding arbitration in accordance with the foregoing procedure. Such right shall not be exclusive of any other rights which a party may have to pursue a course of legal action in an appropriate forum. Enforcement of any arbitration award, decision or order may be sought in any court having competent jurisdiction.

*Id.* §§ 13.1–13.2.

## C. The Hawaii Restaurant Litigation

Benihana of Tokyo's instant claims arise out of a series of disputes between the parties regarding the terms of the License Agreement and the sale of hamburgers at the Hawaii restaurant. In a letter dated July 30, 2013, Benihana America notified Benihana of Tokyo that it was in violation of certain terms of the License Agreement, including through its unauthorized sale of hamburgers, and that it had 30 days to cure the violations. Answer Ex. 6.

After receiving two extensions of the cure period, on September 23, 2013, Benihana of Tokyo sought a temporary restraining order and preliminary injunction to stay the running of the cure period pending arbitration of the dispute.  *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 13 Civ. 6766 (PAE) (S.D.N.Y. 2013) ("*Benihana I*"), Dkt. 1 Ex. A.  After argument on October 1, 2013, during which Benihana of Tokyo conceded that its continued sale of hamburgers at the Hawaii restaurant was not permitted by the Agreement, this Court denied Benihana of Tokyo's petition.  *Benihana I*, Dkt. 9, 10.  Later that day, counsel for Benihana of Tokyo represented to counsel for Benihana America, via email, that "Benihana of Tokyo will not be selling hamburgers in Hawaii."  Answer Ex. 7.

On December 13, 2013, Benihana America again notified Benihana of Tokyo that it was in violation of certain terms of the Agreement and that it had 30 days to cure the violations. Answer Ex. 8.

On January 13, 2014, Benihana of Tokyo filed a demand for arbitration with the American Arbitration Association and sought a declaratory judgment that it had not breached the Agreement.  Answer Ex. 9.  In the meantime, Benihana of Tokyo continued to sell hamburgers at the Hawaii restaurant.  *See Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 14 Civ. 792 (PAE) (S.D.N.Y. 2014) ("*Benihana II*"), Dkt. 19 at 24.

On February 5, 2014, Benihana America served Benihana of Tokyo with written notice of termination of the Agreement, effective February 15, 2014.  Answer Ex. 10.  The letter cited as cause for termination Benihana of Tokyo's continuing breaches of the Agreement, which included the unauthorized sale of hamburgers at the Hawaii restaurant.  Benihana America demanded that Benihana of Tokyo comply with the post-termination requirements set forth in Section 12.4, which required that Benihana of Tokyo immediately discontinue use of the

trademarks in Hawaii, effectively distinguish the Hawaii restaurant from its former appearance, and no longer hold itself out as a Benihana restaurant.  *Id.*; *see also* License Agreement §§ 12.4(a)–(b).  Notwithstanding this letter, Benihana America alleges here that Benihana of Tokyo nonetheless continued, and continues, to operate and use the Benihana restaurant and trademarks in Hawaii.  Countercl. ¶ 44.[4]

Also on February 5, 2014, Benihana America served its answer and counterclaims in the arbitration.  *See Benihana II*, Dkt. 2 ¶ 41.

On February 7, 2014, Benihana America filed the petition for a preliminary injunction in aid of arbitration in *Benihana II*, seeking to enjoin Benihana of Tokyo "(1) from selling hamburgers or other unauthorized food items on the premises of the Benihana restaurant it operates in Hawaii pursuant to the License Agreement, or using or publishing advertisements, publicity, signs, decorations, furnishings, equipment, or other matter employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo,' or the 'flower' symbol that have not been approved in accordance with Article 5.2 of the License Agreement; and (2) from arguing to the arbitration panel that it be permitted to cure any defaults if the arbitrators rule that Respondent breached the License Agreement."  *Id.* ¶ 43.  Benihana America also sought an award of fees, pursuant to the License Agreement, for costs incurred in *Benihana I* and *II*.  *Id.*; Dkt. 15 at 10.  After briefing and argument, on February 26, 2014, this Court granted Benihana America the requested relief, except as to the fees requested in connection with *Benihana I*.  *See Benihana II*, Dkt. 17, 19.

---

[4] "Countercl." refers to the second portion (¶¶ 1–97) of Dkt. 7, after the heading "Counterclaims," where paragraph numbering restarts at 1.  "Answer" refers to the first portion (¶¶ 1–20) of Dkt. 7.

### D.  The Website Letter

In a separate letter dated December 13, 2013, Benihana America wrote to Benihana of Tokyo, objecting to Benihana of Tokyo's registration of the domain name www.benihanaworld.com (the "Website") and to certain of its statements on the Website. Compl. Ex. B ("Website Letter").  Specifically, the Website Letter objected to (1) the Website's statement that Benihana of Tokyo "control[s] the territories of Hawaii, Canada, Mexico, Europe, the Middle East, Australia, and Asia," on the grounds that, as to Hawaii, Benihana of Tokyo is a mere licensee; (2) the Website's statement that Benihana of Tokyo operates franchises "all around the world," on the grounds that Benihana America has the exclusive right to operate Benihana restaurants in certain portions of the world, *i.e.*, the United States, the Caribbean, Central America, and South America; (3) the Website's boast that Benihana of Tokyo is "the world's leader in family fun" and "the global leader in dining hospitality," again on the grounds that Benihana of Tokyo's reach is not truly global; and (4) the Website's boast that Benihana of Tokyo is the "originator of the unique hibachi cooking style and 'eatertainment' created in the United States," alleging that the boast was an attempt to create confusion among consumers and to trade on the goodwill residing in Benihana America's trademarks.  *See id.*  Benihana America asserted that these statements violated Section 43(a) of the Lanham Act.  *Id.*  It demanded that Benihana of Tokyo act immediately to remove the statements from the Website and from any other advertising or promotional materials.  *Id.*

### E.     The Instant Action

On January 10, 2014, Benihana of Tokyo brought this action, seeking a declaratory judgment that the statements on its website referenced in the Website Letter do not violate the Lanham Act, because they are truthful.  *See* Compl.

On March 20, 2014, Benihana America answered the Complaint and asserted eight counterclaims.  Dkt. 7.  Each counterclaim alleges conduct concerning the Hawaii restaurant, the Website, or both.  The counterclaims are as follows:

**TABLE 1: BENIHANA AMERICA'S COUNTERCLAIMS**

| Count | Locus of Conduct | Allegation |
|---|---|---|
| Count 1: Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114 | Hawaii | Use of the Benihana trademarks in Hawaii despite the termination of the License Agreement |
| Count 2: False Designation of Origin and Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a) | Hawaii & Website | Improper and unauthorized use of the Benihana trademarks |
| Count 3: Common Law Trademark Infringement | Hawaii & Website | Improper and unauthorized use of the Benihana trademarks |
| Count 4: Common Law Unfair Competition | Website | "[C]reating the false impression that [Benihana of Tokyo] owns or operates Benihana restaurants in the Territory where [Benihana America] owns exclusive rights." |
| Count 5: Deceptive Trade Practices under N.Y. Gen. Bus. Law § 349 | Website | Misuse of the Benihana trademarks and false and/or misleading statements |
| Count 6: Trademark Dilution under the Lanham Act, 15 U.S.C. § 1125(c) | Hawaii & Website | Use of the Benihana trademarks in connection with unauthorized goods in Hawaii and the misleading Website |
| Count 7: Trademark Dilution under N.Y. Gen. Bus. Law § 360-1 | Hawaii & Website | Use of the Benihana trademarks in connection with unauthorized goods in Hawaii and the misleading Website |
| Count 8: Breach of Contract | Hawaii | Breach of the License Agreement |

Source: Countercl. ¶¶ 47–97.

On April 14, 2014, this Court accepted this case as related to the prior lawsuits.  *See* Dkt. 11.  In a telephone conversation on April 17, 2014, counsel for Benihana of Tokyo informed counsel for Benihana America that Benihana of Tokyo planned to move to dismiss its Complaint without prejudice and would submit the dispute to arbitration instead.  Dkt. 30 ("Manson Decl.") ¶ 7.  In response, counsel for Benihana America stated that Benihana America opposed arbitration and would oppose any motion to compel arbitration.  *Id.*

On April 21, 2014, counsel for Benihana of Tokyo gave Benihana America written notice that it was submitting the dispute to arbitration, pursuant, it stated, to Section 13.2 of the License Agreement.  Manson Decl. Ex. 6.

### F.      Benihana of Tokyo's Motion to Compel Arbitration

On May 2, 2014, Benihana of Tokyo filed (1) a motion to voluntarily dismiss its Complaint, Dkt. 24; and (2) a motion to dismiss, or, alternatively, to stay this action, and to compel arbitration of Benihana America's counterclaims, Dkt. 28.  Benihana of Tokyo argues that the License Agreement's second arbitration provision, Section 13.2, permits either party to compel arbitration of certain claims.  *See* Dkt. 29 ("Pl. Br.") at 10–11.  It argues that Benihana America's counterclaims fall within the scope of Section 13.2.  *Id.* at 11–13.

On May 23, 2014, Benihana America filed its opposition.  Dkt. 35 ("Def. Br."). Benihana America disputes that the License Agreement compels arbitration of its counterclaims. It argues, in essence, that most of the claims and counterclaims in the case have nothing to do with the License Agreement and therefore fall outside its arbitration provision, Section 13.2.  *See id.* at 4–5.  In any event, Benihana America argues, to the extent there are claims that arise "in connection with" the License Agreement and therefore come within Section 13.2, arbitration under that section is permissive, not mandatory.  *Id.* at 5–7.

On May 30, 2014, Benihana of Tokyo replied.  Dkt. 37 ("Pl. Reply Br.").   On June 5, 2014, the Court heard argument.  Dkt. 40 ("Tr.").

## II.      Relevant Legal Principles under the Federal Arbitration Act

The Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. § 1 *et seq.*, "'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'"  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts."  *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

The Act accordingly provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Act is based on Congress's powers to regulate interstate commerce and admiralty.  It applies to "any maritime transaction or a contract evidencing a transaction involving commerce."  *Id.*; *see Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984); *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 405 (1967).

Notwithstanding the strong "national policy favoring arbitration" evinced by Congress's enactment of the FAA, *see Southland*, 465 U.S. at 10, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted).  Therefore, the FAA's presumption of arbitrability does not apply to the threshold issue of whether the parties entered into a binding agreement to arbitrate in the first instance.  *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011).  As a general matter, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law principles that govern the formation of contracts," *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and "ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions," *Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir. 1996).

III.     **The Motion to Compel Arbitration**

Given these directives, the Second Circuit has held that a court asked to stay proceedings

pending arbitration, or to compel arbitration, must resolve four issues:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75–76 (2d Cir. 1998); *accord Genesco, Inc. v. T.*

*Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987).

Here, the parties agree that the License Agreement constitutes a valid and enforceable

contract; that it contains arbitration provisions; and that the federal statutory claims are not, as a

matter of Congressional intent, nonarbitrable *per se*.  They dispute only (1) whether Section 13.2

of the Agreement triggers "mandatory" or "permissive" arbitration,[5] and (2) to what extent it

applies to the claims brought in this lawsuit.[6]

---

[5] "'Mandatory' arbitration requires arbitration if either of the parties elects to pursue it; 'permissive' arbitration requires arbitration only with the consent of both parties." *Travelport Global Distrib. Sys. B.V. v. Bellview Airlines Ltd.*, No. 12 Civ. 3483 (DLC), 2012 WL 3925856, at *3 n.2 (S.D.N.Y. Sept. 10, 2012).

[6] Benihana America also argues that Benihana of Tokyo waived its right to compel arbitration by bringing this declaratory judgment action. Def. Br. 7–9.  The waiver argument fails for two reasons.  First, waiver is presumptively an issue for the arbitrator to decide, and Benihana America has not made any showing why that presumption is rebutted by the terms of the License Agreement.  *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir. 2011) ("Both waiver and estoppel generally fall into that latter group of issues presumptively for the arbitrator.").  Second, were this a decision for the Court, the Court would hold that Benihana of Tokyo has not waived its right to arbitration.  Benihana of Tokyo has not engaged in protracted litigation.  It filed the motion to compel arbitration only about two months after the Complaint had been served, after the complexion and scale of the litigation was changed markedly by the filing of Benihana America's counterclaims, and before an initial pretrial conference had even been held.  *See Tech. in P'ship, Inc. v. Rudin*, 538 F. App'x 38, 39 (2d Cir. 2013) ("[A] party can waive its right to arbitration 'when it engages in protracted litigation that prejudices the opposing party.'") (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000)).

A.      **The Parties' Arbitration Agreement is Mandatory**

Although the parties clearly agreed to arbitrate certain disputes, they dispute whether

Section 13.2 contemplates *mandatory* arbitration—in other words, whether it permits one party

to compel arbitration without the other's consent.  Benihana of Tokyo argues that it does, such

that one party's decision to invoke arbitration "takes precedence over the other party's desire to

litigate either in court or in any other forum," and that arbitration "became mandatory when

[Benihana of Tokyo] provided written notice to [Benihana America] that it would invoke

arbitration."  Pl. Reply Br. 6.  Benihana America counters that although Section 13.1 provides

for mandatory arbitration of disputes over termination, Section 13.2 contemplates "permissive"

or optional arbitration of all other disputes.  Def. Br. 2, 5–7.

This presents a question of construction.  Benihana America argues that the first sentence

of Section 13.2 contemplates permissive arbitration: "In the event any other dispute arises

between the parties hereto in connection with the terms or provisions of this Agreement, either

party by written notice to the other party *may* elect to submit the dispute to binding arbitration in

accordance with the foregoing procedure."  License Agreement § 13.2 (emphasis added); *see

also* Def. Br. 6–7.  It also relies on the second sentence of Section 13.2: "Such right shall not be

exclusive of any other rights which a party may have to pursue a course of legal action in an

appropriate forum."  License Agreement § 13.2; *see also* Def. Br. 6.  Finally, Benihana America

notes that the text of Section 13.2 contrasts with that of Section 13.1, which uses the mandatory

term "shall" to require that disputes related to termination be settled by arbitration.  *See* License

Agreement § 13.1 ("If this Agreement shall be terminated by Licensor and Licensee shall dispute

Licensor's right of termination, or the reasonableness thereof, the dispute shall be settled by

arbitration."); *see also* Def. Br. 7.  Benihana America argues that to read Section 13.2 as

providing for mandatory arbitration "would effectively read the phrase 'shall not be exclusive' out of the agreement" and "render meaningless" the differences between Sections 13.1 and 13.2. Def. Br. 6–7.

These arguments are not ultimately persuasive. As to the first sentence, that a party "may" elect to submit a dispute to binding arbitration merely means that neither party is obliged to initiate ("submit a dispute to") arbitration. The word "may" does not, however, mean that if a party has elected to do so, the other may neutralize that choice by insisting on litigating in court. To the contrary, courts have commonly construed such language as indicative of mandatory arbitration. *See Travelport*, 2012 WL 3925856, at *4 ("The overwhelming balance of authority in this circuit and elsewhere indicates that, absent some separate suggestion that an Arbitration Provision is intended to trigger permissive arbitration, provisions with the word 'may' trigger mandatory arbitration."); *N.Y. Cross Harbor R.R. Terminal Corp. v. Consolidated Rail Corp.*, 72 F. Supp. 2d 70, 76–77 (E.D.N.Y. 1998) ("[P]laintiff points to what it perceives as the permissive language of the arbitration clause: 'Either party may . . . refer any dispute or an event(s) of default . . . to arbitration.' To illustrate that the parties understood the import of using the permissive term 'may,' the plaintiff refers to the numerous other times in the arbitration clause that the parties used the mandatory terms 'shall' and 'will.' As a result, according to [plaintiff], a plain language reading of [the] contract reveals that there is no mandatory arbitration clause. Unfortunately for plaintiff, courts have repeatedly rejected this very argument.") (citations omitted) (collecting cases); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n.1 (1985) ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures.").

Further, Benihana America's construction, under which only two-party consent could trigger arbitration, would make Section 13.2 meaningless.  "After all, parties can always submit a dispute to arbitration if both consent."  *Travelport*, 2012 WL 3925856, at \*4.  Benihana America does not explain what purpose Section 13.2 would serve if it permits arbitration only by mutual consent.  *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (citation omitted).  Accordingly, "[i]t follows that the word 'may' was used to mandate arbitration at the insistence of any one party to the agreement, but to indicate that arbitration was not mandatory absent the invocation of the provision by one of the parties."  *Chiarella v. Vetta Sports*, No. 94 Civ. 5933 (PKL), 1994 WL 557114, at \*3 (S.D.N.Y. Oct. 7, 1994).

Benihana America relies on *Local 771, L.A.T.S.E, AFL-CIO v. RKO General, Inc.*, 546 F.2d 1107 (2d Cir. 1977) for the proposition that the word "may" signifies mandatory arbitration only in situations where the contract does not "'impl[y] that the parties had the option of invoking some remedy other than arbitration.'"  Def. Br. 6 (quoting *RKO General*, 546 F.2d at 1116).  *RKO General*, however, is inapposite.  The issue there was whether arbitration was the *exclusive* remedy available to the parties, so as to bar a federal-court lawsuit.  *RKO General* did not, however, concern the issue here, which is whether, upon a motion to compel, arbitration is compulsory.[7]  Given the issue before the Second Circuit in *RKO General*, it was clearly relevant that the contract did not "impl[y] that the parties had the option of invoking some remedy other

---

[7] *RKO General* arose in an unusual posture.  The defendant there had already prevailed in arbitration:  the arbitrator held that the plaintiff's lawsuit was time-barred.  Plaintiff therefore moved to overturn that award and compel arbitration on the merits, whereas defendant sought to confirm that award and dismiss the federal-court lawsuit as barred by the mandatory arbitration clause.  *See RKO General*, 546 F.2d at 1111–12.

than arbitration." *RKO General*, 546 F.2d at 1116.  But the fact that an agreement containing an arbitration clause refers to alternative mechanisms for dispute resolution, such as litigation, does not speak to the issue of whether a party's election to submit the dispute to arbitration makes that election compulsory.

For much the same reasons, the second sentence of Section 13.2 does not carry the day for Benihana America.  Benihana America is right that it "expressly allows the parties to bring non-termination claims in any forum, including this Court" and that "[a]ccordingly, arbitration of non-termination disputes is permitted, but not required."  Def. Br. 6.  This is so, in the sense that a party is free to initiate litigation and not to avail itself of the arbitration option.  But that does not mean that arbitration is "permissive" in the way that Benihana America claims, *i.e.*, permitting either party to negate, in favor of litigation in court, the other's submission of the case to arbitration.  The more reasonable reading of the second sentence is simply to underscore that a party is not obliged to initiate arbitration when a dispute, other than with regard to termination, arises "in connection with the terms or provisions of this Agreement."  It does not provide that, if arbitration is sought by one party, the other may deflect that bid.  *See, e.g.*, *Chiarella*, 1994 WL 557114, at *3 (finding that language similar to that at issue here required arbitration if the provision was invoked by either party).  Indeed, on Benihana America's reading, the second sentence of Section 13.2 would, by providing for arbitration only upon mutual consent, improbably codify a preference for *non*-arbitral means of dispute resolution over arbitration, such that, in a dispute, the party who preferred in-court resolution of a controversy would invariably hold a trump card over the party who preferred arbitration.

Benihana America argues that this reading saps the second sentence of Section 13.2 of meaning, but that is not so.  That sentence underscores the right of a party to initiate suit in court,

and in any appropriate forum, subject to, as provided in the first sentence, the right of "either party by written notice to the other party [to] elect to submit the dispute to binding arbitration." *See* License Agreement § 13.2.[8]  It also effectively prevents a court from *sua sponte* dismissing a party's lawsuit on the grounds that (as with termination claims under Section 13.1) the parties committed the dispute to resolution *only* in an arbitral forum.  For that reason, Benihana America is, finally, wrong that Benihana of Tokyo's reading makes Section 13.2 indistinguishable from Section 13.1.  Section 13.1 expressly requires the arbitration of termination-related disputes, and subjects lawsuits relating to such disputes to dismissal on the grounds that the Agreement precludes them.  In contrast, Section 13.2 permits, but does not require, "either party" to submit "any other dispute . . . in connection with the terms and provisions of this Agreement" to arbitration.

For these reasons, the Court holds, Section 13.2 does not *require* arbitration of disputes within its scope, but indicates that arbitration is mandatory once invoked by either party.

## B.  The Scope of the Arbitration Agreement

As an alternative ground for opposing the motion to compel arbitration, Benihana America argues that Section 13.2 does not reach its counterclaims.  The majority of these pertain, in whole or part, to statements on Benihana of Tokyo's website.  Such counterclaims, Benihana America argues, do not "aris[e] . . . in connection with the terms or provisions" of the Hawaii License Agreement, as Section 13.2 requires.  *See* Def. Br. 4; *see also supra* Table I.  As to this

---

[8] Lawsuits subject to a binding arbitration clause are often initially filed in a court, and only later directed to binding arbitration, after a motion to compel arbitration has been made pursuant to an agreement between the parties.  *See, e.g.*, *Sanders v. Forex Capital Mkts. LLC*, No. 11 Civ. 0864, 2011 WL 5980202 (CM), at *3–4 (S.D.N.Y. Nov. 29, 2011); *Stolt Tankers BV v. Allianz Deguros S.A.*, No. 11 Civ. 2331 (SAS), 2011 WL 2436662, at *4–5 (S.D.N.Y. June 16, 2011); *Hird v. iMergent, Inc.,* No. 10 Civ. 166 (DLC), 2011 WL 43529, at *1 (S.D.N.Y. Jan. 6, 2011).

point, Benihana America is correct:  The substantial majority of its counterclaims do not arise in

connection with the Hawaii License Agreement, but involve extraneous conduct by Benihana of

Tokyo that is not subject to that agreement.

The Second Circuit has established a roadmap for determining whether a particular

dispute falls within the scope of an agreement's arbitration clause:

> First, recognizing there is some range in the breadth of arbitration clauses, a court
> should classify the particular clause as either broad or narrow.  [Second], if
> reviewing a narrow clause, the court must determine whether the dispute is over an
> issue that "is on its face within the purview of the clause," or over a collateral issue
> that is somehow connected to the main agreement that contains the arbitration
> clause.  Where the arbitration clause is narrow, a collateral matter will generally be
> ruled beyond its purview.  Where the arbitration clause is broad, there arises a
> presumption of arbitrability and arbitration of even a collateral matter will be
> ordered if the claim alleged implicates issues of contract construction or the parties'
> rights and obligations under it.

*Louis Dreyfus Negoce S.A. v. Blystad Shipping*, 252 F.3d 218, 224 (2d Cir. 2001) (citations

omitted); *accord JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004).

### 1.     Section 13.2 is a Broad Arbitration Clause

The first inquiry therefore is whether Section 13.2 is a "broad" or "narrow" arbitration

clause.  *Louis Dreyfus*, 252 F.3d at 224.  Benihana of Tokyo argues that it is broad.  Pl. Br. 11.

Benihana America wisely does not contest this point:  Section 13.2 is clearly a broad clause.

Indeed, it is quite similar to many arbitration clauses that the Second Circuit has held to be

broad.  *Compare* License Agreement § 13.2 (pertaining to "any other dispute aris[ing] between

the parties hereto in connection with the terms or provisions of this Agreement"); *with Collins &

Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (describing clause

submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" as "the paradigm of a broad clause"); *Leadertex, Inc. v. Morganton Dyeing &

Finishing Corp.*, 67 F.3d 20, 27 (2d Cir. 1995) (describing clause submitting to arbitration "[a]ny

controversy or claim arising under or in relation to this order or contract, or any modification

thereof" as "broadly written"); *Oldroyd*, 134 F.3d at 76 (describing clause submitting to

arbitration "[a]ny dispute, controversy or claim arising under or in connection with" the

agreement as "the prototypical broad arbitration provision"); *Mehler v. Terminix Int'l Co. L.P.*,

205 F.3d 44, 49 (2d Cir. 2000) (describing clause providing for arbitration of "any controversy or

claim between [the parties] arising out of or relating to" the agreement as "a classically broad

one"); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35–36 (2d Cir. 2002) (classifying

clause requiring arbitration of "all disputes relating to th[e] Agreement (excepting any dispute

relating to intellectual property rights)" as broad.  Indeed, in this Circuit, the narrow arbitration

clause is something of an endangered species.  *See China Auto Care, LLC v. China Auto Care

(Caymans)*, 859 F. Supp. 2d 582, 586 (S.D.N.Y. 2012) ("In the Second Circuit, the class of

arbitration clauses considered 'narrow,' is, functionally, a class of one.");[9] *Gerling Global Reins.

Co. v. Ace Prop. & Cas. Ins. Co.*, 42 Fed. App'x 522, 523–24 (2d Cir. 2002) (rare recent case

finding clause narrow; it applied only to "irreconcilable differences of opinion" that concern "the

interpretation" of reinsurance certificates); *McDonnell Douglas Fin. Corp. v. Pa. Power & Light

Co.*, 858 F.2d 825, 832 (2d Cir. 1988) (finding arbitration clause narrow that was limited to the

---

[9] The "class of one" to which *China Auto Care* refers is *In re Kinoshita*, 287 F.2d 951 (2d Cir. 1961) (construing arbitration clause that began, "[i]f any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York . . . . "). The Second Circuit has all but overturned *Kinoshita*, repeatedly narrowing its holding to its "'precise facts'— that is, to the phrase 'arising under' or, at most, to 'its equivalent.'"  *ACE Capital Re Overseas, Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 33 (2d Cir. 2002) (quoting *S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984)); *accord Louis Dreyfus*, 252 F.3d at 225 ("We have . . . since limited [*Kinoshita*'s] holding to its facts, declaring that absent further [language of] limitation, only the precise language in *Kinoshita* would evince a narrow clause.").  Section 13.2 does not contain the "precise language" used in *Kinoshita*.

context of a particular paragraph of the parties' agreement and the circumstances surrounding a party's actions pursuant to that paragraph).

### 2.   Application of Section 13.2 to Each Counterclaim

The Court next applies the clause to each counterclaim, mindful of the presumption of arbitrability.  An issue may be arbitrable either because (1) on its face, it falls within the purview of the arbitration clause, or (2) in the case of a broad arbitration clause, the issue is a collateral matter that "implicates issues of contract construction or the parties' rights and obligations under it."  *Louis Dreyfus*, 252 F.3d at 224 (citation omitted).

### i.   Count 8 is Facially Within the Purview of Section 13.2

Count 8, the breach of contract claim, is facially within the purview of the arbitration clause.  *See* Countercl. ¶¶ 93–97.  Count 8 "arises . . . in connection with the terms or provisions" of the Hawaii License Agreement, because it alleges that Benihana of Tokyo breached that agreement "by failing to operate the Hawaii restaurant in strict compliance with the standards outlined in the agreement."  *Id.* ¶ 96.[10]  Benihana America concedes that Count 8 "requires an analysis of the Hawaii License Agreement."  Def. Br. 4 n.2.  Accordingly, the motion to compel arbitration is granted as to Count 8.

### ii.   Standard for the Collateral Counterclaims

As to the remaining counterclaims, which are collateral to the Agreement, the decisive question is whether they "implicate[ ] issues of contract construction or the parties' rights and

---

[10] This count would be arbitrable even if Section 13.2 were narrow.  *See Louis Dreyfus*, 252 F.3d at 224 (issue that "is on its face within the purview of the [arbitration] clause" is presumptively arbitrable even under a narrow arbitration clause).  The Court has decided the arbitrability of Count 8 after determining the breadth of Section 13.2 because the Second Circuit has directed district courts to follow this sequence of analysis.  *See id.* at 224–25.

obligations under it." *Louis Dreyfus*, 252 F.3d at 224 (citation omitted). "In determining whether a claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco*, 815 F.2d at 846 (citing *Mitsubishi Motors*, 473 U.S. at 622 n.9, 624 n.13); *accord JLM Indus.*, 387 F.3d at 173; *Vera v. Saks & Co.*, 335 F.3d 109, 117 (2d Cir. 2003); *Specht*, 306 F.3d at 36.

The Second Circuit's analytic approach in *Genesco* is instructive as to this mode of analysis. There, a clothing manufacturer, Genesco, brought 15 common law and statutory claims against two of its principal fabric suppliers, all broadly deriving from the same factual claims. *See Genesco*, 815 F.2d at 846–47. Genesco alleged that, for years, the suppliers had overcharged it for goods purchased under certain purchase and sale agreements, which contained arbitration clauses. *Id.* Defendants accomplished these overcharges and inappropriate sales, Genesco asserted, by conspiring with and bribing its vice-president for purchasing. *Id.* The Second Circuit noted that "the parties each paint a different picture of the controversy," with plaintiff emphasizing its claims of conspiracy and bribery and defendants focusing on the allegations of overcharges and defective goods. *Id.* at 846. Both characterizations were based on factual allegations in the Complaint. *Id.* at 847. Because of the "dual contractual and tortious nature of the action," the *Genesco* Court was faced with "a difficult arbitrability question." *Id.* In resolving the issue, the Court looked for guidance to the Supreme Court's precedents on arbitrability. *Id.* at 846–47. From this caselaw, the Court distilled the following conclusion: "If the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* at 846 (citing *Mitsubishi*, 473 U.S. at 624 n.13). Analyzing the factual allegations underlying each claim, the Court held that plaintiff's racketeering and Robinson-Patman Act claims derived from

the parties' transactions under the sales agreements, *see id.* at 847–48, 853–54, but the tortious

interference claim based on allegations of commercial bribery was unrelated to those

agreements, *see id.* at 856.  Accordingly, the court held that the statutory claims came within the

scope of the arbitration clause, but the tortious interference claim did not.  *See id.* at 856.

Here, Benihana America makes two distinct sets of factual allegations in support of its

counterclaims.  The first, entitled "[Benihana of Tokyo's] Misleading Website and Infringing

Conduct," reiterates and expands on the allegations contained in the Website Letter.  *See*

Countercl. ¶¶ 13–23.  It alleges, in essence, that Benihana of Tokyo's website overstates its

global presence and falsely states that Benihana of Tokyo "control[s] the territor[y] of Hawaii."

*Id.*  These claims present a mirror image of Benihana of Tokyo's declaratory judgment claim.

The second set is entitled "Benihana of Tokyo's Breach of the May 15, 1995 License

Agreement."  *See id.* ¶¶ 24–46.  It recounts the history of the Hawaii Agreement and prior

litigation before this Court; it also recaps the alleged breaches by Benihana of Tokyo that led to

its termination by Benihana America, the subject, as noted, of an ongoing arbitration.  *Id.*

Significantly, each collateral counterclaim alleges unlawful conduct by Benihana of

Tokyo concerning (1) the Hawaii restaurant, (2) the Website, or (3) both.  *See supra* Table 1.

These three categories provide a useful mechanism for analyzing arbitrability.

       *iii.*        *Category 1: Collateral Counterclaims Related Only to Hawaii*

The only collateral counterclaim that alleges exclusively Hawaii-related conduct is Count

1, for trademark infringement under the Lanham Act.  *See* Countercl. ¶¶ 47–55.  Count 1 alleges

that "[Benihana of Tokyo] is using Benihana trademarks in Hawaii, despite [Benihana

America's] termination of [Benihana of Tokyo's] limited-use license with respect to such

marks."  *Id.* ¶ 50.  Count 1 does not allege additional infringing conduct or articulate any other

factual basis for this claim.  The counterclaims note that, upon Benihana America's termination of the License Agreement, Benihana of Tokyo lost the right to use the Marks, and was obliged to discontinue doing so.  Countercl. ¶ 43 (citing License Agreement § 12.4).  The resolution of Count 1, therefore, will turn on whether Benihana America's termination of the Agreement was or was not justified.  This, in turn, squarely implicates issues of construction of the Hawaii License Agreement and the parties' performance thereunder.  Accordingly, the motion to compel arbitration is granted as to Count 1.

> iv.    *Category 2: Collateral Counterclaims Related Only to the Website*

The second category of collateral counterclaims allege conduct only on Benihana of Tokyo's Website.  This category includes two claims: Counts 4 and 5.

Count 4 alleges that Benihana of Tokyo is "creating the false impression that [it] owns or operates Benihana restaurants in the Territory where [Benihana America] owns exclusive rights." Countercl. ¶ 69; *see generally id.* ¶¶ 67–72.  This allegation appears to refer to the Website's statements that Benihana of Tokyo operates franchises "all around the world," is "the world's leader in family fun," and is "the global leader in dining hospitality"; Benihana America has alleged that these statements are actionable because Benihana of Tokyo's reach is not, in fact, truly global.  *Id.* ¶¶ 19–21.  Count 4 also appears to raise claims about the image, on the Website's homepage, of "a rotating globe with various well-known landmarks from around the world in the background, including the Statue of Liberty"—this image, Benihana America claims, "not only gives the misleading impression that [Benihana of Tokyo] owns or operates Benihana restaurants throughout the world, but also that it specifically owns or operates locations in New York."  *Id.* ¶ 15.

Benihana of Tokyo argues that these claims are "logically dependent upon the resolution of the License Agreement termination in arbitration."  Pl. Reply Br. 4.  That is wrong.  The truth or falsity of Benihana of Tokyo's boasts of global reach has nothing to do with whether or not it operates a single restaurant in the isolated islands of Hawaii, let alone the terms and conditions of the License Agreement that governs that restaurant.

Benihana of Tokyo alternatively tries to construe Count 4 to incorporate the allegation in paragraph 16 that it has falsely claimed that it "control[s] the territor[y] of Hawaii."  *See* Pl. Reply Br. 4; Countercl. ¶ 16.  But that is a strained and implausible reading.  Count 4 indeed alleges that Benihana of Tokyo is "creating the false impression that [it] owns or operates Benihana restaurants in the Territory where [Benihana America] owns exclusive rights."  *See* Countercl. ¶ 69.  However, there is no rational reason to construe this language as relating to Hawaii.[11]  On its face, Count 4 says nothing about Hawaii.  And, as the pleadings in this case and the prior lawsuits amply reflect, Benihana America is of course well aware that Benihana of Tokyo *is* operating a Benihana restaurant in Hawaii.  *See id.* ¶ 44.  Indeed, Benihana America's repeated grievance against Benihana of Tokyo has been that Benihana of Tokyo has run that restaurant in a manner that breaches the License Agreement.  From Benihana America's perspective, therefore, whatever other allegations may be made about Benihana of Tokyo's conduct with regard to the Hawaii restaurant, it may not be said that Benihana of Tokyo is falsely

---

[11] As explained *infra*, Count 5 does incorporate the allegation in paragraph 16 that Benihana of Tokyo has falsely claimed that it "control[s] the territor[y] of Hawaii."  Countercl. ¶ 16.  The reason that Count 5 incorporates this allegation, while Count 4 does not, is that Count 5 is more broadly worded than Count 4.  Count 5 alleges that "the false and/or misleading statements on [the] website, www.benihanaworld.com, constitute deceptive trade and business practices under New York law."  *Id.* ¶ 74.  As such, the phrase "the false and/or misleading statements" incorporates *all* of the statements that the counterclaims earlier allege to be false or misleading, including the allegation in paragraph 16 concerning who controls Hawaii.

claiming to run a restaurant in Hawaii when it is not doing so.  Put differently, from Benihana America's point of view, the problem is that Benihana of Tokyo's Hawaii restaurant *does* exist, not that it is falsely claimed to exist.[12]

Accordingly, because Count 4 does not implicate the License Agreement or the parties' rights or obligations thereunder.  It is, therefore, not subject to arbitration under Section 13.2.

Count 5 alleges that "the misuse of the Benihana Trademarks and the false and/or misleading statements on [the] website, www.benihanaworld.com, constitute deceptive trade and business practices under New York law."  Countercl. ¶ 74; *see generally id.* ¶¶ 73–80.  Fairly read, this broad reference to "false and/or misleading statements on [the] website" refers to all of the Website statements that the counterclaims allege to be tortious.  Accordingly, it includes the statements, which the Court has held are unrelated to the License Agreement, that Benihana of Tokyo operates franchises "all around the world," is "the world's leader in family fun," is "the global leader in dining hospitality," and is "the originator of the unique hibachi cooking style and 'eatertainment' created in the United States."  *Id.* ¶¶ 19–22.  To the extent it is based on these representations, Claim 5 is not subject to arbitration.

To be sure, the Website allegedly includes one statement that does, in small part, implicate the Hawaii License Agreement:  the Website represents that Benihana of Tokyo "control[s] the territories of Hawaii, Canada, Mexico, Europe, the Middle East, Australia, and

---

[12] Benihana of Tokyo separately argues that the website claims are "no longer viable" because it "removed the Statue of Liberty and all references to Hawaii from its website several weeks ago." Pl. Reply Br. 4 (citing Dkt. 38 ("Manson Decl. II") ¶ 10).  Be that as it may, that fact, whatever its relevance, bears on merits issues that will be litigated in the ultimate tribunal.  It does not bear on the limited issue at hand, which is whether and to what extent to compel arbitration.  In any event, to the extent that Benihana of Tokyo makes this point to suggest that some of Benihana America's claims may be moot, the Court notes that the counterclaims seek retrospective as well as prospective relief.  *See* Countercl. ¶ 97(b).

Asia." *Id.* ¶ 16.  Benihana America alleges that this statement is false and actionable because Benihana of Tokyo "does not control the Hawaii territory"; rather, it was, previously, a licensee. *Id.* ¶ 17.  In disputing the accuracy of this Website statement, the parties therefore dispute which Benihana entity "controls" Hawaii.  This dispute appears to be picayune in the extreme, and it is not clear to the Court whether Benihana America intends to litigate this fine point.  But, to the extent Benihana America brings claims based on this Website statement and does seek to put at issue "control" of the Hawaii territory, that issue does, ultimately, turn on the meaning of the License Agreement and/or the validity of its termination of Benihana of Tokyo's license. Therefore, to the limited extent Count 5 alleges deceptive trade and business practices based on the statement that Benihana of Tokyo "controls" the territory of Hawaii, it is arbitrable; to that limited extent, the motion to compel arbitration is granted.  Otherwise, the motion to compel arbitration as to Count 5 is denied, because Count 5 alleges deceptive trade and business practices based on Website statements that are unrelated to operations in Hawaii.

>      *v.*     *Category 3:  Collateral Counterclaims Alleging Both Hawaii and Website Conduct*

The remaining counterclaims allege conduct on Benihana of Tokyo's part occurring both on the Website and in Hawaii.

Counts 2 and 3 allege, identically, that Benihana of Tokyo's "improper and unauthorized use of the Benihana Trademarks in Hawaii and on [its] website, www.benihanaworld.com" constitutes false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and common law trademark infringement, respectively.  Countercl. ¶ 58 (Count 2); *id.* ¶ 64 (Count 3); *see generally id.* ¶¶ 56–62 (Count 2); *id.* ¶¶ 63–72 (Count 3).

Similarly, Counts 6 and 7 allege, identically, that Benihana of Tokyo has diluted the value of the Benihana trademarks "[b]y using the Benihana Trademarks in connection with the

sale of unauthorized goods in Hawaii and in connection with [its] misleading website," in violation of the Lanham Act, 15 U.S.C. § 1125(c), and N.Y. Gen. Bus. Law § 360-1, respectively.  Countercl. ¶ 83 (Count 6); *id.* ¶ 90 (Count 7); *see generally id.* ¶¶ 81–87 (Count 6); *id.* ¶¶ 88–92 (Count 7).

The use of the Benihana trademarks on the Website does not implicate issues of contract construction or the parties' rights and obligations under the Hawaii License Agreement.  The License Agreement sets forth only the parties' agreement that Benihana of Tokyo will operate a single Benihana franchise in Hawaii and makes no reference to, and does not control, Benihana of Tokyo's general advertising on its main website.  In fact, Benihana America and Benihana of Tokyo acknowledge that they are parties to a primary agreement, the ARA, still in effect, that predates the License Agreement and governs their broader business relationship, including the allocation of their rights in the Benihana trademarks.  It is the ARA, not the License Agreement, which covers the website dispute.  Neither party claims that the License Agreement governs their conduct outside Hawaii.  It does not.

However, each of Counts 2, 3, 6, and 7 also alleges improper use of the Benihana trademarks in Hawaii itself, *i.e.*, in connection with the Hawaii restaurant.  As discussed with regard to Count 1, these portions of Counts 2, 3, 6, and 7 appear to rest on the same allegation: That Benihana of Tokyo's continued use of the trademarks *in Hawaii* is wrongful, given Benihana America's termination of the License Agreement.  Indeed, nowhere in its Answer does Benihana America allege facts suggesting that Benihana of Tokyo's use of the trademarks in Hawaii would have been unlawful had the Agreement not been terminated.  These claims therefore appear to turn instead on the arbitrators' ultimate determination of whether Benihana America's termination of the Agreement was proper.  To the extent the claims of the improper

use of trademarks in Hawaii turn on anything else, it would appear to be whether Benihana of Tokyo complied with the terms under the License Agreement for the use of the trademarks in Hawaii.

Accordingly, to the extent Counts 2, 3, 6, and 7 allege trademark infringement or dilution with respect to the use of the Benihana trademarks on the Website, they are nonarbitrable; to the extent they allege trademark infringement or dilution with respect to the use of the trademarks in Hawaii, they are arbitrable.

### D. Whether to Stay the Balance of the Proceedings Pending Arbitration

Where a court holds that some, but not all, claims in a case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration. *See Oldroyd*, 134 F.3d at 75–76. Benihana of Tokyo asks the Court to do so here. It argues that the nonarbitrable claims are "logically dependent" upon whether the License Agreement was validly terminated. Pl. Br. 15. That is not so. To the extent Benihana America's claims (or portions thereof) are logically dependent upon whether the License Agreement was validly terminated, those claims (and portions of claims) are the ones as to which the Court grants the motion to compel arbitration. The remaining claims (and portions thereof) are nonarbitrable precisely because they concern Website-related conduct whose resolution is not logically dependent upon the validity of termination.

Accordingly, there is no reason to delay adjudication of Benihana America's separate and distinct claims. On the contrary, expeditiously moving this litigation forward is more likely to bring this long-running controversy to an end. The Court therefore declines to stay litigation as to Benihana America's nonarbitrable claims.

**IV.     The Motion to Voluntarily Dismiss the Complaint**

Benihana of Tokyo separately moves to voluntarily dismiss its own Complaint, pursuant to Federal Rule of Civil Procedure 41(a)(2). Dkt. 24–25. It appears to seek such dismissal regardless of this Court's adjudication of its motion to compel arbitration of Benihana America's counterclaims. *See* Tr. 12–14. Benihana America does not oppose voluntary dismissal of the Complaint. *See* Def. Br. 9.

Benihana America argues that, under Rule 41(a)(2), even if the Complaint is dismissed, its counterclaims must remain pending for adjudication. Def. Br. 9. Benihana of Tokyo recognizes that this is so, *i.e.,* that dismissal of its own Complaint will not bring about dismissal of Benihana America's counterclaims to the extent that those claims have survived the motion to compel arbitration. Pl. Reply Br. 9.

For the time being, the Court will not order dismissal of the Complaint. That is because this decision, and in particular the Court's denial of significant aspects of Benihana of Tokyo's motion to compel arbitration, conceivably may reshape Benihana of Tokyo's views of the wisdom of that course. The Court directs Benihana of Tokyo to submit to the Court, by August 21, 2014, a letter stating whether it still seeks to dismiss its own Complaint. Should Benihana of Tokyo then ask it to do so, the Court will grant that motion.[13]

---

[13] Benihana America seeks an award of fees if the Court dismisses the Complaint as requested. Def. Br. 9. The request is denied. "Courts within this circuit have refused to award fees and costs following a Rule 41(a)(2) dismissal absent circumstances evincing bad faith or vexatiousness on the part of the plaintiff." *BD ex rel. Jean Doe v. DeBuono*, 193 F.R.D. 117, 125 (S.D.N.Y. 2000). Benihana America has not made, nor has it attempted to make, such a showing.

**CONCLUSION**

For the foregoing reasons, Benihana of Tokyo's motion to compel arbitration of Benihana America's counterclaims is:

- as to Counts 1 and 8, granted;

- as to Count 4, denied;

- as to Count 5, denied, except to the limited extent Count 5 alleges deceptive trade and business practices based on the statement that Benihana of Tokyo "controls" the territory of Hawaii; to that limited extent, the motion to compel arbitration is granted; and

- as to Counts 2, 3, 6, and 7, granted, to the extent those counts allege trademark infringement or dilution with respect to use of the Benihana trademarks in Hawaii; and denied to the extent they allege trademark infringement or dilution with respect to use of the Benihana trademarks on the Website.

To the extent the Court has granted the motion to compel arbitration, the Court stays litigation as to those claims pending the outcome of arbitration. The Court does not, however, stay the balance of this case. Benihana of Tokyo's motion to dismiss its Complaint is denied, without prejudice to the right of Benihana of Tokyo to move for such relief following review and consideration of this decision.

To assure clarity of the claims at issue going forward, the Court directs Benihana America, by Thursday, July 31, 2014, to submit a new pleading, entitled "Amended Counterclaims," limited to those counterclaims and portions thereof as to which the Court has denied the motion to compel arbitration. The amended counterclaims are to be drafted to

conform to the rulings herein.  For avoidance of doubt, the Court does not authorize Benihana America to otherwise substantively revise its counterclaims.

By August 14, 2014, counsel for Benihana of Tokyo and Benihana America are to meet and confer, in person, for at least one hour, to discuss the future course of this litigation, and to attempt to resolve it.

If that meeting does not resolve this litigation then, by August 21, 2014, Benihana of Tokyo is to answer the counterclaims and state whether it wishes to voluntarily dismiss its own Complaint.  On September 12, 2014, at 9 a.m., the Court will hold an initial pretrial conference. In preparation for that conference, by September 9, 2014, the parties shall submit (1) a Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules, available at http://www.nysd.uscourts.gov/judge/Engelmayer; and (2) a joint letter, not to exceed three pages in length, addressing the following topics in separate paragraphs: a brief description of the case, including the factual and legal bases for the claim(s) and defense(s); any contemplated motions; and the prospect for settlement.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 24 and 28.


SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge


Dated: July 22, 2014
        New York, New York