USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-19-17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BENIHANA OF TOKYO, LLC, as successor to
BENIHANA OF TOKYO, INC.,

        Plaintiff and Counter Defendant,

-v-

BENIHANA, INC., as successor to BENIHANA
NATIONAL CORP. and NOODLE TIME, Inc.,

        Defendants and Counter Claimants,

-v-

KEIKO AOKI,

        Counter Defendant.

------------------------------------------------------------X

14 Civ. 224 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss counterclaims by Benihana, Inc. ("BI") and Noodle Time, Inc. against Benihana of Tokyo, LLC ("BOT") and Keiko Aoki, BOT's chief executive officer. BOT originally brought this action, but, after BOT's voluntary dismissal of its claims and the Court's ruling that certain of BI's counterclaims were required to be resolved in arbitration, the only remaining claims are those brought by BI and Noodle Times in their Third Amended Counterclaims ("TACC"). Those claims are under the Lanham Act, for trademark infringement, false designation of origin and unfair competition, and trademark dilution. BOT now moves to dismiss these claims.

For the reasons that follow, the Court denies the motion to dismiss.

**I.     Background**

    **A.     Factual Summary**[1]

The Court assumes familiarity with the background and procedural history of this case, including the decision in *Benihana of Tokyo, LLC v. Benihana, Inc.*, 73 F. Supp. 3d 238 (S.D.N.Y. 2014), which dismissed some of BI's counterclaims in favor of arbitration. The Court also assumes familiarity with the long and tangled history of legal disputes between these parties in this Court, including *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, No. 16 Civ. 3800 (PAE), 2017 WL 933111 (S.D.N.Y. Mar. 8, 2017), in *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7248 (PAE), 2016 WL 3913599 (S.D.N.Y. July 15, 2016), and *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015). The following is a brief summary of the claims in this case, drawing upon the TACC.

BI[2] alleges that, under the March 17, 1995 Amended and Restated Plan of Reorganization ("ARA") between BI and BOT, it owns rights to the various Benihana trademarks and service marks (the "Trademarks") in the United States, Central America, South America, and the Caribbean (the "Territory," as referred to in the ARA), while BOT owns the trademarks and service marks outside of the Territory. TACC ¶ 9; *see also id.* ¶ 10 (list of Benihana trademarks owned by BI). In the ARA, BI and BOT agreed that neither would use the Trademarks in such a way that could reasonably be expected to reduce the value or the usefulness of the Trademarks to

---

[1] The Court's summary of the facts is drawn from the TACC, Dkt. 87, and its attached exhibits, which are incorporated by reference in the TACC. For the purpose of resolving the motion to dismiss, the Court assumes all well-pleaded facts to be true and draws all reasonable inferences in favor of pleading party. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] For ease of reference, the Court will refer to BI and Noodle Time together as "BI." Noodle Time is BI's wholly-owned subsidiary. It owns the United States trademark registrations for the various Benihana trademarks. TACC ¶ 10.

either party. *Id.* ¶ 12; *see also* TACC, Ex. A ("ARA"), § 7.10. Overall, the ARA gives BI the right to operate Benihana restaurants in the United States, save in Hawaii, where BOT has a contractual license from BI to do so. Currently, BI owns 66 Benihana restaurants and franchises 11 others within the Territory. For its part, BOT owns or franchises 19 Benihana restaurants outside the Territory, plus the Hawaii restaurant, located in Honolulu. *Id.* ¶ 13.

In summary, BI alleges that BOT and Aoki have violated BI's trademark rights as secured by the Lanham Act, through (1) statements, images, and other content on BOT's website, (2) statements in various press releases, and (3) statements by Keiko Aoki.

For example, as alleged, on or about September 4, 2012, BOT established a website with the domain name www.benihanaworld.com "to advertise and promote BOT's business as the 'world-wide' leader." *Id.* ¶ 14. This domain name, BI alleges, is accessible in the United States and "perpetuates the false impression stated on BOT's original (and also still active) website (benihana-of-tokyo.com/eatertainment.php) that it is BOT that 'has more than 100 locations worldwide, in more than 20 countries,'" and wrongly suggests that "BOT owns or operates Benihana restaurants throughout the world and/or has the right to use the BENIHANA® Trademarks throughout the world." *Id.* ¶¶ 14–15. The website initially featured a rotating globe featuring various famous global landmarks, including the Statue of Liberty. This, BI alleges, gave website visitors "the misleading impression that BOT owns or operates Benihana restaurants" in the United States generally and in New York. *Id.* ¶¶ 17–18. In fact, BI notes, it has the exclusive rights to operate Benihana restaurants in the Territory and to use the Benihana Trademarks there. *Id.* After BI brought its counterclaims, the Statue of Liberty was removed from BOT's rotating globe. *Id.* ¶ 18.

3

BI alleges that other statements on the same website misstated BOT's geographic rights to operate Benihana restaurants. For example, it alleges that "BOT inaccurately identifies the areas controlled by BOT" so as to state that BOT 'now control[s] the territories of Hawaii, Canada, Mexico, Europe, the Middle East, Australia, Asia, and Africa,'" *id.* ¶ 19 (modifications in original), and that "BOT 'operates privately with franchisees all around the world that emulate and carry out the vision of Rocky Aoki,'" *id.* ¶ 21. In fact, BI alleges, "BOT does not have the right to operate Benihana restaurants 'all around the world.'" *Id.* BI further alleges that statements on BOT's website "make it unclear that BOT's rights are separate and distinct from those of BI, which has exclusive ownership of the BENIHANA® Trademarks in the Territory and the exclusive right to operate Benihana restaurants within the Territory." *Id.* ¶ 23. BOT's website further states that it is "'the originator of the unique hibachi cooking style and 'eatertainment' created in the United States,'" which, BI alleges, gives the "false impression that BOT owns and operates Benihana restaurants within the United States where the brand was first launched in 1964, has some sort of partnership with BI in operating such restaurants, or that BI operates as a BOT franchisee or licensee." *Id.* ¶ 24. This, BI alleges, "causes customer confusion and damages the Benihana brand and image within the Territory." *Id.*

BI also alleges violations in connection with BOT's opening of a restaurant "named KOA (presumably using [counter defendant] Keiko Ono Aoki's initials)," in connection with which BOT issued a press release, held special events, and made statements on its website. *Id.* ¶ 27. As alleged, BOT's press release confused customers by conflating its rights to the Benihana brand with BI's rights. For example, the press release referenced a "'Benihana restaurant chain' with 'over 100 locations in 15 countries' that is now in its '50th year'" so as to imply that that chain was "BOT, the entity purportedly opening KOA." *Id.* BI also alleges that, in celebrating

4

the 50th anniversary of the Benihana restaurants, BOT assembled "a Japanese hip-hop dance duo dubbed the 'Beni-Girls'" and promoted itself with the statement that "both hip-hop dance and Benihana were created in New York." *Id.* ¶ 28. The intended effect of this, BI alleges, was to "create confusion and the knowingly false impression that BOT is in fact the entity operating the Benihana restaurants located in New York, and that BOT owns the goodwill and history of 'the Benihana restaurant chain,' which according to the BOT/KOA press release, has 'over 100 locations in 15 countries.'" *Id.* BI also alleges that BOT and Aoki created a website called "Keiko Aoki Inner Makeup," which purported to offer sushi catering services in New York City, "featuring a 'live performance' by a 'veteran sushi chef' fully clad in a Benihana uniform, bearing the BENIHANA® logo." *Id.* ¶ 30 & Ex. H.

### B. Procedural Background

The Court describes here only background relevant to BI's counterclaims.

On January 13, 2014, BOT filed the original complaint in this action. Dkt. 1. On March 20, 2014, BI filed an answer with a broad set of counterclaims against BOT. Dkt. 7. On May 2, 2014, BOT filed a motion to voluntarily dismiss its complaint, Dkt. 24, and a motion to dismiss BI's counterclaims, or, in the alternative, to stay this action and compel arbitration of BI's counterclaims, Dkt. 28. On July 22, 2014, the Court issued a decision in which it denied BOT's motion to dismiss, but granted its motion to compel arbitration of certain of BI's counterclaims and denied its motion to compel arbitration of others. Dkt. 42. As to the claims that the Court did not order be resolved in arbitration, on July 31, 2014, BI filed amended counterclaims. Dkt. 43. Later, on November 3, 2014, the Court granted leave for BI to file Second Amended Counterclaims, Dkt. 58, Ex. A. Dkt. 60. On February 18, 2015, the Court stayed discovery in this case pending the arbitration. Dkt. 68.

On September 1, 2016, the Court granted BI leave to file the TACC. Dkt. 86. On September 30, 2016, BI filed the TACC. Dkt. 87. On October 14, 2016, BOT filed a motion to dismiss and, in support, a memorandum of law ("BOT Br.") and the Declaration of Joseph L. Manson III, attaching the ARA and License Agreement at issue in these cases. Dkts. 89–91.[3] On October 28, 2016, BI filed a memorandum of law in opposition, Dkt. 92; on November 4, 2016, BOT filed a reply memorandum of law, Dkt. 94. On December 16, 2016, BOT asked the Court to stay discovery pending resolution of its motion to dismiss the TACC, Dkt. 97; on December 22, 2016, BI filed a letter in opposition, Dkt. 99. On January 18, 2017, the Court issued an order declining to stay discovery. Dkt. 101. On April 6, 2017, at the parties' request, the Court granted an extension of time to complete depositions to April 28, 2017. Dkt. 103.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th*

---

[3] It appears an inadvertently truncated version of the License Agreement was attached to the Declaration of Joseph L. Manson III, Dkt. 91, Ex. B. The complete License Agreement is available at Dkt. 7, Ex. 1.

*Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks, citation, and alteration omitted) (emphasis in *Arista Records*).

## III. Discussion

The TACC brings three counterclaims against BOT and Aoki: for (1) trademark infringement, under § 32 of the Lanham Act, 15 U.S.C. § 1114, TACC ¶¶ 33–39; (2) false designation of origin and unfair competition under § 43 of the Lanham Act, 15 U.S.C. § 1125(a), TACC ¶¶ 40–46, and (3) trademark dilution, under § 43 of the Lanham Act, 15 U.S.C. § 1125(c), TACC ¶¶ 47–53. BI seeks injunctive relief and costs for corrective advertising, as well as attorneys' fees and costs.

Although § 32 of the Lanham Act concerns registered marks, whereas § 43 concerns unregistered, common law marks, *see Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003), claims under these provisions are subject to the same analysis, *id.*; *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114–16 (2d Cir. 2006). As such, "to prevail on a trademark infringement, false designation of origin, or unfair competition claim under [these provisions], a plaintiff must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,

--- F. Supp. 3d. ---, No. 14 Civ. 4869 (PAE), 2016 WL 4784004, *21 (S.D.N.Y. Sept. 13, 2016) (citing, *inter alia*, *Virgin Enters.*, 335 F.3d at 146).

As for the first element, that the mark is entitled to protection, a certificate of registration with the Patent and Trademark Office is prima facie evidence that the mark is registered, valid and entitled to protection, and that the registrant owns the mark and has the exclusive right to use the mark in commerce. *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012) (citations omitted). Here, BI alleges that it is the exclusive registrant and owner of the Benihana trademarks in the United States. TACC ¶¶ 10–11. Therefore, BI has adequately pleaded the first element.

As for the second element, the likelihood of confusion, courts in the Second Circuit generally look to the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), and, in doing so, "district courts must be careful to maintain a focus on the ultimate issue of the likelihood of consumer confusion," *Malletier v. Burlington Coat Factory Warehouse, Corp.*, 426 F.3d 532, 538 (2d Cir. 2005). These factors include "the strength of [the mark], the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Polaroid*, 287 F.2d at 495.

To establish the second element, a plaintiff must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark," *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993), "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the [defendant's] mark," *Hormel Foods Corp. v.*

*Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996). "Affiliation confusion exists where use of a 'unique and recognizable identifier' could lead consumers to 'infer a relationship' between the trademark owner and the new product." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) (quoting *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005)).

Claims for trademark dilution brought under federal law entitle the owner of a "famous, distinctive mark" to an injunction against use of a mark that is likely to cause dilution of that famous mark, either by (1) "blurring" or (2) "tarnishment." *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (citing 15 U.S.C. § 1125(c)). Dilution by blurring is "an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," *id*. (quoting 15 U.S.C. § 1125(c)(2)(B)); it may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," *id.* (quoting 15 U.S.C. § 1125(c)(1)). The touchstone of a blurring action is to prevent "the whittling away of an established trademark's selling power through its unauthorized used by others." *Id.* (quoting *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989)). Dilution by tarnishment, in contrast, is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Starbucks*, 588 F.3d at 110 (quoting 15 U.S.C. § 1125(c)(2)(C)). "A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.* (quoting *Hormel Foods*, 73 F.3d at 507).

Measured against these standards, the TACC plausibly alleges acts of trademark infringement, false designation of origin and unfair competition, and trademark dilution under the Lanham Act. BI has alleged that BOT has used various Benihana marks—owned by BI—in ways that would cause consumers confusion about whether BI or BOT was the operator of Benihana restaurants in America; whether BI had undertaken advertising campaigns that in fact BOT undertook, such as the "Beni-Girls" campaign; and whether BI was offering products that in fact were offered by BOT, such as the "Keiko Aoki Inner Makeup" in-home sushi catering service in New York City. The alleged conduct is of a nature that, if established, could support liability under the statute.

BOT's motion to dismiss mainly makes two different arguments.

First, it argues, BI has not stated Lanham Act claims because BOT's alleged conduct was a legally protected, and hence not an actionable, "use" of the Trademarks. *See* BOT Br. at 10–12. For a statement to constitute actionable "commercial advertising or promotion" under § 43 of the Lanham Act requires that the statement be "(1) commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Boule v. Hutton*, 328 F.3d 84, 90–91 (2d Cir. 2003) (internal modifications and citation omitted). Relevant here, statements in response to a reporter's solicitation for comment on a matter of public concern and inextricably intertwined with the reporter's coverage of the topic and in the news article generally cannot be a basis for liability under the Lanham Act, as such discussion is protected by the First Amendment, when on "an issue of public importance and occur[ing] in a forum that has traditionally been granted full protection under the First Amendment." *Id.* at 91.

Invoking this principle, BOT argues that BI's claims to the extent based on statements made in media interviews cannot support Lanham Act liability. That argument fails, because the TACC does not bring claims based on statements made in newspaper articles. Its claims instead are based on statements BOT made in press releases and in advertising on its and Keiko Aoki's websites. It fails, too, because the TACC does not allege statements on matters of public importance. *See* TACC ¶¶ 14–30. The statements at issue were instead routine instances of commercial speech intended to promote BOT's products or service and disseminated to the public. These fall within the meaning of "use" under the Lanham Act.

BOT next argues that its use of the marks was permitted by contract—the ARA. On this premise, BOT argues, while BI may bring claims for breach of contrast, under a line of Lanham Act case law, BI cannot bring claims under the Lanham Act unless BI pleads a sufficiently grave breach of that contract to rise to the level of justifying rescission or pleads at least a breach of the ARA. *See* BOT Br. at 5–9.

This line of case law aligns with § 32 of the Lanham Act, which provides for liability only for a person who acts "without the consent of the registrant," 15 U.S.C. § 1114(1).[4] It holds that where a valid contract gives a party (the licensee) a right use the trademarks of another (the licensor), the existence of the contractual license may bar the licensor from bringing Lanham Act claims against the licensee, except where the licensee's contract breach was so grave as to support rescission of the contract. The foundational Second Circuit case so holding is *Affiliated*

---

[4] The TACC adequately alleges that BI is the registrant of the Benihana trademarks, TACC ¶¶ 10–11, giving it rights under § 32 of the Lanham Act, which gives "the registrant" with remedies for trademark infringement, 15 U.S.C. § 1114, and § 43, which makes liable "any person who believes that he or she is or is likely to be damaged" by the relevant unlawful conduct, 15 U.S.C. § 1125(a). As for trademark dilution, the "owner" of a relevant mark may bring a claim for such under 15 U.S.C. § 1125(c). BOT does not dispute the adequacy of the TACC's allegations as to these elements.

*Hospital Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183 (2d Cir. 1975). There, the Second Circuit held, when a license agreement "controls the rights of the respective parties in the use of the [trademark]," for a licensor to bring a Lanham Act claim for trademark infringement, it must first "demonstrate conduct" by the licensee "sufficiently grave to warrant rescission of that agreement"; otherwise, the licensor's remedies sound in breach of contract. *Id.* at 1186; *see also IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 407 (S.D.N.Y. 2009) (plaintiffs may bring only breach of contract claims when alleged breaches of relevant license agreement did not rise to the level permitting rescission of the agreement, even though alleged conduct, absent a license arrangement, "would normally constitute trademark infringement" (citing *Affiliated Hospital Prods.*, 513 F.2d at 1186)).

To assess whether these principles apply, courts have therefore closely examined the terms of the relevant contract. They have inquired whether the agreement in fact conveyed a license to the alleged infringer, so as to permit a contract claim to proceed based on breach of the license agreement. Thus, for example, in *Affiliated Hospital Prods.*, the Second Circuit noted that the trademark infringement action was based on species of trademark uses that the license agreement expressly permitted. The Second Circuit accordingly limited the plaintiff licensee's recovery to contract damages unless it could show that the defendant licensee's conduct had been grave enough to justify rescission of the contract. *See Affiliated Hospital Prods.*, 513 F.3d at 1186 ("Absent grounds for rescission, [licensee] has had since March 2, 1970 the right to use the [trademark], and [licensor] has only the right to compensatory damages for breach of the agreement."); *see also Sterling Drug Inc. v. Bayer AG*, 792 F. Supp. 1357, 1371 n.12 (S.D.NY. 1992) ("where trademark rights have been conveyed by contract, both contract and trademark law apply in determining the parties' rights and may provide separate grounds for relief"), *aff'd*

*in part and vacated in part*, 14 F.3d 733 (2d Cir. 1994). Where, however, the agreement does not convey rights to the licensor with respect to certain uses,[5] the licensee has been held not to have waived its right to pursue Lanham Act claims for infringement. *See, e.g.*, *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 365–67 (5th Cir. 2004) (as to uses outside of those contemplated by license under agreement, trademark claims barred only if contract language precludes such a suit "for uses *outside of* those contemplated and permitted in the agreement"; contract at issue did not do so, thereby permitting plaintiff to bring Lanham Act claims).

Measured under these standards, BOT's argument that the ARA is a license agreement of the sort addressed in *Affiliated Hospital Prods.*, so as to leave BI with contract but not Lanham Act remedies, is unpersuasive. Simply put, the ARA is not a license agreement. It does not give BOT any license whatsoever to use the marks at issue within BI's geographic area—the Territory (roughly, the Americas). The ARA instead effects a worldwide geographic division which allocates trademark rights exclusively to BI in certain geographic areas and trademarks rights exclusively to BOT in others. The relevant provision reads, in its entirety, as follows:

> **Section 7.10 <u>Trademarks</u>.** Each of BOT and Benihana [BI] acknowledge that, from and after the Effective Time, Benihana will own the Trademarks in the Territory and BOT will continue to own the Trademarks outside of the Territory. Accordingly, each of BOT and Benihana agree that, without the prior written consent of the other, neither will make any use of the Trademarks which could reasonably be expected to reduce the value or usefulness of the Trademarks to the other party. In addition, each of BOT and Benihana shall be responsible for the proper registration and maintenance of the Trademarks and the prosecution of infringements or potential infringements of the Trademarks in the territories where such party has an interest in the Trademarks. Each of BOT and Benihana agrees to notify the other promptly of any infringement or potential infringement of the Trademarks of which such party becomes aware and to cooperate with the other party in any action taken to prosecute any such infringement. The obligations of this Section shall survive the Closing for an indefinite period.

---

[5] Such an agreement is often referred to as a "consent to use" agreement. *See* 3 McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed. 2017).

ARA § 7.10.

This provision does not give BOT any rights to use the Benihana marks within the United States. Quite the contrary, it recognizes that within the Territory, BI alone owns the Benihana trademarks. Within that Territory, BI has the exclusive duty of assuring "the proper registration and maintenance of the Trademarks" and of prosecuting infringements of the marks. And while the ARA requires BI and BOT (1) not to use the marks in manners that would decrease their value or usefulness without the other's written consent and (2) to cooperate in the prosecution of infringing conduct, these provisions do not say or imply that BI or BOT has any right, within the other's territory, to use, control, or assign the marks. The ARA is thus a prohibitory document with respect to use of the marks. And, because it affords BOT no usage rights whatsoever in BI's territory—and vice versa—it lacks various hallmarks of a licensing agreement or consent to use agreement: It does not set out the metes and bounds of permitted versus prohibited uses. And it lacks any remedial provisions.

In sum, the ARA does not give BOT any trademark rights within the United States or waive any of BI's rights as to that geographic area. BI is at liberty to pursue Lanham Act claims against BOT for acts of trademark infringement within BI's Territory.[6]

---

[6] BI and BOT have entered into a separate License Agreement, Dkt. 7, Ex. 1, pursuant to ARA § 8.02(d), which granted "BOT rights to use the Trademarks in the Territory in connection with the 'Benihana of Tokyo' Restaurant located in Honolulu, Hawaii and . . . perpetual, exclusive rights to own or operate 'Benihana of Tokyo' restaurants in the State of Hawaii. . . ." ARA § 8.02(d). But that agreement is irrelevant here, because BOT's alleged acts of infringement do not relate to the BOT restaurant in Hawaii that is the subject of that License Agreement. BOT is not otherwise a licensee in the Territory of any of the trademarks. That the parties (pursuant to the ARA) entered into a License Agreement for the Hawaii restaurant confirms that the ARA itself does not give BOT any license to use the trademarks in the Territory or restrict BI's right to relief under the Lanham Act within the Territory. Indeed, the License Agreement sets forth a detailed scheme of permissible uses and of remedies, stating, for example, "Licensee [BOT] will use such Marks only in the manner and to the extent specifically permitted in this Agreement. . . .

14

BOT relies on cases far afield. For example, it cites *G&F Licensing Corp. v. Field & Stream Licenses Co., LLC*, No. 09 Civ. 10197 (LTS) (GWG), 2010 WL 2900203, at *4 (S.D.N.Y. July 16, 2010), for the proposition that parties who agree to advise each other of infringing activities and to cooperate to fight infringement thereby waived Lanham Act claims against each other. BOT Br. at 8. *G&F Licensing* held nothing of the sort. The plaintiff there was clearly the licensee of the defendant, and therefore could, at most, bring a claim for infringement under the Lanham Act on behalf of the trademark owner licensor but could not assert the licensor's ownership rights against the trademark owner licensor itself. *G&F Licensing*, 2010 WL 2900203 at *4. Here, by contrast, BOT is not BI's licensee.

In sum, the ARA is of quite a different character from the licensing agreements that have been held to limit licensors—barring rescission-level breaches—to contract damages. Because BI has not granted BOT any license to use the marks within BI's Territory as relevant here, BI is not limited to bringing breach of contract claims. It is at liberty to pursue Lanham Act claims, as it has done.

For the reasons above, the Court holds that BI, as owner of the Benihana Trademarks within the United States, has stated Lanham Act claims against BOT for its allegedly infringing uses of those trademarks within the United States.

## CONCLUSION

For the foregoing reasons, the Court denies BOT's motion to dismiss the TACC. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 89.

---

Licensee shall appropriately indicate the ownership of the marks whenever they are used by Licensee. . . . Any and all advertising, publicity, signs, decorations, furnishings, equipment or other matter employing in any way whatsoever the words 'Benihana', 'Benihana of Tokyo,' or the 'flower' symbol shall be submitted to [BI] for its approval prior to publication or use." License Agreement Art. 5.2.

SO ORDERED.

Paul A. Engelmayer  
United States District Judge

Dated: April 19, 2017  
New York, New York