UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

BENIHANA OF TOKYO, LLC, as successor to
BENIHANA OF TOKYO, INC.,

Plaintiff and
Counter-Defendant,

-v-

BENIHANA, INC., as successor to BENIHANA
NATIONAL CORP., and NOODLE TIME, INC.,

Defendants and
Counter-Plaintiffs,

-v-

KEIKO AOKI,

Counter-Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/25/18

14 Civ. 224 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves an application for attorneys' fees and costs incurred during one

lawsuit in a long-running series among the two corporate entities that run different parts of the

worldwide Benihana restaurant empire. The chapter of these disputes covered by this lawsuit

involves claims under the Lanham Act: specifically, claims by Benihana, Inc. ("BI") that the

other entity, Benihana of Tokyo, LLC ("BOT") and its chief executive, Keiko Aoki ("Aoki")

repeatedly engaged in false and misleading marketing practices. BI and its fellow counter-

plaintiff, Noodle Time, Inc. (collectively with BI, "BI") prevailed in this case: BOT and Aoki

capitulated after opening statements at trial and agreed to a settlement that gave BI substantively

all the relief it sought, in the form of a broad injunction.

Pending now is BI's motion for an award of fees and costs under § 1117 of the Lanham

Act from BOT and Aoki. For the reasons that follow, the Court, after careful consideration of

1

the relevant circumstances and the parties' submissions, finds that BI is entitled to fees and costs totaling $936,665.24, less than the figure ($1,212,897.02) that BI requested.

This decision proceeds in three parts. First, the Court briefly reviews this lawsuit and the tortuous recent litigation history between these parties. The Court then addresses BI's claims of entitlement to fees and costs under the Lanham Act. The Court then explains its determination as to the proper amount of the award.

## I.     Background

The Court assumes familiarity with the background and procedural history of this case, including the decisions in *Benihana of Tokyo, LLC v. Benihana, Inc.*, 73 F. Supp. 3d 238 (S.D.N.Y. 2014) (*"Benihana I"*), which dismissed some of BI's counterclaims in favor of arbitration; and *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2017 WL 1424325 (S.D.N.Y. Apr. 19, 2017) (*"Benihana II"*), which denied BOT's motion to dismiss BI's remaining counterclaims. The Court also assumes familiarity with the related lawsuits that have unfolded over the past five years between BI and BOT in this Court. Consequential decisions in those cases include *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018); *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7428 (PAE), 2016 WL 3913599 (S.D.N.Y. July 15, 2016); and *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015). These parties have also crossed swords in other courts and in arbitration proceedings. *See, e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 622 F. App'x 169 (3d Cir. 2015); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, No. CV 15-00028 (ACK)(RLP), 2015 WL 5439357 (D. Haw. Sept. 14, 2015).

The following are the key facts and procedural history of this distinct matter.

## A.    Factual Background[1]

In 1963, Benihana of Tokyo, Inc. was incorporated by Rocky Aoki.  In 1964, he opened the first Benihana of Tokyo restaurant in New York City.  Dkt. 122 ("Joint Pretrial Order" or "JPTO") at 3.

The Benihana restaurant empire is today operated by two distinct corporations, BOT and BI.  Pursuant to a contract entitled the Amended and Restated Agreement and Plan of Merger ("ARA"), executed on December 29, 1994 and amended March 17, 1995, BI received the right to operate Benihana restaurants and to own and use Benihana trademarks in the United States, Central America, South America, and the Caribbean ("the Territory").  BOT retained the rights to operate Benihana restaurants and use Benihana trademarks outside the Territory.  *See Benihana I*, 73 F. Supp. 3d at 243 (S.D.N.Y. 2014); Dkt. 122 at 3–4.  As of 2016, when it filed its final amended counterclaims in this case, BI owned or franchised 77 restaurants within the Territory, whereas BOT owned or franchised 19 restaurants outside of the Territory.  Under a license agreement with BI that has been subject of several of the lawsuits and an arbitration, *see, e.g., Benihana I*, 73 F. Supp. 3d at 243, BOT also operated a Benihana restaurant in Honolulu, Hawaii.  *See* Dkt. 87 ("TACC") ¶ 13.

## B.    Procedural History

This lawsuit focused on claims by BI of Lanham Act violations by BOT.  On December 13, 2013, BI sent a letter to BOT, claiming such violations.  *See* Dkt. 1-3, Ex. B.

---

[1] The Court incorporates by reference the detailed background to this matter set out in its earlier opinions in this litigation.  *See Benihana I*, 73 F. Supp. 3d at 243–47; *Benihana II*, 2017 WL 1424325 at *1–2.  Where germane, the Court also draws on the briefs and declarations submitted on the instant motion for fees and costs.  *See* Dkts. 135–36, 140–41, 145, 147–50.  The Court also draws undisputed background facts from sources including the joint Statement of Stipulated Facts contained in the parties' Joint Pretrial Order filed September 22, 2017.  Dkt. 122 at 3–7.

Examples of such violations as cited there by BI included the following:

- "BOT's claim [on its website www.benihanaworld.com] that it operates franchises 'all around the world' is . . . false, material and misleads the consuming public into believing that BOT owns the BENIHANA Trademarks and/or has the right to operate BENIHANA restaurants in every country in the world when it does not. . . . [BI] owns exclusive rights to the BENIHANA Trademarks in the United States, the Caribbean, Central America and South America. Therefore, BOT's statements here are entirely false and misleading." *Id.* at 2.

- "BOT makes several references [on its website] to 'Benihana of Toyko' as the 'Global Leader' or 'World Leader' in teppanyaki. . . . BOT makes such statements knowing that BOT cannot be a 'world leader' or 'global leader' since BOT does not have the right to operate BENIHANA restaurants and does not own the BENIHANA Trademarks throughout the world. BOT's rights are limited geographically and its rights are separate, apart, and distinct from [BI's] rights— therefore, any suggestion to the contrary is false, misleading, and damaging to [BI's] reputation and [BI's] goodwill. It appears that BOT is attempting to trade on Benihana's presence in the marketplace and to deceive consumers into believing that [BI] and BOT are one and the same . . . . At the same time, the website refers to [BI] as a 'subsidiary company,' which is knowingly false." *Id.* at 2.

- "BOT claims to be the 'originator of the unique hibachi cooking style and "eatertainment" created in the United States.' BOT has assigned all rights to the BENIHANA System and the BENIHANA Trademarks in the United States, the Caribbean, South America, and Central America. Its statement that it is the originator in the United States is intended to create confusion among consumers that there continues to be an affiliation, sponsorship, or partnership between [BI] and [BOT] (a relationship which BOT claims it controls) and to trade on the goodwill residing in our client's BENIHANA Trademarks." *Id.* at 2–3.

On January 13, 2014, BOT responded by filing the initial complaint in this case. It sought a declaratory judgment that its website did not violate the Lanham Act. *See* Dkt. 1 at 6.

On March 20, 2014, BI filed its answer to the complaint. It also filed counterclaims against BOT for, under the Lanham Act, trademark infringement, false designation of origin and unfair competition, and trademark dilution; and for, under New York law, common law trademark infringement, common law unfair competition, deceptive trade practices, trademark dilution, and breach of contract. *See* Dkt. 7 ("Answer") at 17–23. The factual allegations that BI cited in support largely reprised, and expanded upon, those in its initial letter to BOT.

On May 2, 2014, BOT filed motions to arbitrate BI's counterclaims. It also moved to dismiss its own claim for a declaratory judgment. Dkts. 24 & 28. BI opposed the motion to compel arbitration. Dkt. 35. On July 22, 2014, this Court issued a decision in which, in addition to granting BOT's unopposed motion to dismiss its claim for a declaratory judgment, it denied in principal part BOT's motion to compel arbitration. The Court, however, granted that motion as to the portion of the Lanham Act claims related to BOT's Hawaii restaurant. That is because the operation and marketing of that restaurant is subject to a unique license agreement that, unlike the ARA, contains an arbitration provision entitling either side to pursue claims in arbitration. Dkt. 42.

On July 31, 2014, BI filed an amended counterclaim, amending the claims remaining to be tried in this Court. Dkt. 43. On February 18, 2015, in the interest of efficiency, the Court stayed discovery, and this case as a whole, pending the outcome of the pending arbitration relating to matters in Hawaii, which included—in addition to other claims by BI of material breaches by BOT—the Lanham Act claims the Court had directed to arbitration. Dkt. 68.

On July 15, 2016, the Court confirmed the arbitral award issued relating to the Hawaii restaurant. *See* 15 Civ. 7428, Dkt. 42. The Court thereafter lifted the stay in this case.

On September 1, 2016, the Court granted BI leave to file third amended counterclaims, Dkt. 86, which, on September 30, 2016, BI filed. *See* Dkt. 87 ("TACC"). The TACC is the operative document on which trial in this case proceeded. The TACC added factual allegations about Lanham Act violations that had occurred after the initiation of this lawsuit.

On October 14, 2016, BOT and Aoki filed a motion to dismiss the TACC, Dkt. 89, which BI opposed, Dkt. 92. On April 19, 2017, this Court denied that motion. It held, *inter alia*, that BI had adequately pled the elements of the claims at issue. Dkt. 104 at 10.

The case then proceeded to a bench trial, for which there was extensive preparation and detailed pretrial submissions. Trial commenced on January 22, 2018. As detailed further below in connection with the Court's assessment of the reasonable fee award, the parties, following opening statements, entered into a settlement.

On January 23, 2018, the Court entered an order embodying the settlement terms. The order enjoined BOT and Aoki from taking specified actions, including "directly or indirectly infringing on the BENIHANA® Trademarks." Dkt. 132 at 1. The injunctive relief to which the parties agreed tracked that which BI had sought in its prayer for relief in the TACC, save for BI's application for fees and costs (an issue the parties' settlement agreement expressly left open, and which is addressed in this decision). *Compare* Dkt. 132 *with* TACC at 13–14. There was no injunctive relief issued against BI in the order. As part of the settlement agreement, BI did, however, agree to certain conditions, including to refrain from using certain language on its websites and to create a landing page on its website that directs visitors to both the BI website and the BOT website. *See* Dkt. 131. The Court, consistent with the settlement agreement, then enjoined BOT and Aoki from infringing on the Benihana trademarks. *See* Dkt. 132.

On February 12, 2018, BI moved for attorney's fees and costs. Dkt. 134 ("BI Br."). On March 5, 2018, BOT filed its opposition, which noted that BI had failed to enter its trial evidence into the record in support of its fee application. Dkt. 139. On March 9, 2018, following letter motions on the subject, the Court authorized BI to file supplemental affidavits attaching the exhibits it needed to support such claims, and authorized BOT to file a new opposition brief in

light of these filings. *See* Dkts. 142–44. On March 14, 2018, BOT filed its revised opposition. Dkt. 146 ("BOT Br."). [2]

### C. Alleged Bad-Faith Conduct by BOT and Aoki

In moving for attorney's fees and costs, BI submitted evidence of various areas of allegedly bad-faith conduct by BOT and Aoki in initiating and litigating this case.

In brief:

First, and most significant, BI argues that BOT and Aoki engaged in the marketing practices that it challenges, and then initiated this lawsuit and through the first day of trial defended these practices, in demonstrable bad faith. As to BOT's state of mind, BI relies on testimony given earlier in related proceedings before this Court by BOT's outside counsel at the time this lawsuit was initiated, Richard Feldman, Esq. Feldman's testimony was received at a June 6, 2017 hearing before this Court, in connection with BI's successful pursuit of sanctions against BOT for breaches of the injunction that the arbitral panel had put in place relating to the Hawaii restaurant; this Court, in confirming the arbitral award, had adopted the injunctive terms in a court order, which BOT proceeded to violate. In the June 2017 hearing, Feldman recounted Aoki's statements to him about her overall strategy and goals in initiating and litigating cases against BI. *See* Dkt. 145-45 ("Feldman Tr.") at 5, 7.[3] Feldman testified that, on numerous occasions, Aoki directed him "that it was her strategy for BOT to challenge and contest the validity of the [agreements between BOT and BI], whether there was merit to those challenges or

---

[2] On March 21, 2018, BI asked the Court to strike the Aoki Declaration, Dkt. 147, the Kato Declaration, Dkt. 148, and the Landolfi Declaration, Dkt. 149, which were not filed with BOT's initial opposition. *See* Dkts. 151–152. The Court declines to do so.

[3] While Feldman's communications with Aoki were privileged at the time, all, including BOT, agree that privilege was waived in the course of later litigation that broke out between Feldman and BOT.

not." Further, Feldman testified that Aoki's "strategy was to instigate confrontations with BI, so that litigation would ensue, so that the threat of actual or potential expenditures of huge sums on legal fees would coerce [BI] into discussions [to further Aoki's goal of reuniting all Benihana restaurants under BOT]," and that Aoki's "overall strategy [was] to force BI to expend large counsel fees contesting her unreasonable actions." Feldman Tr. at 5, 7. Aoki, in a responding submission, denied such bad intentions. She stated that she had "never acted with any intention to violate the Lanham Act," that BOT had not filed this lawsuit for an improper purpose, and that the strategy that Feldman attributed to her would have been "nonsensical." Dkt. 147 ("Aoki Decl.") ¶¶ 15–18.

Second, BI argues, after this case was filed, BOT and Aoki continued to engage in bad faith marketing practices. These principally consisted of continuing to use terms and marks that falsely depicted BOT as a worldwide or global entity, improperly taking credit for BI operations in the substantial part of the world (*i.e.*, the Americas) which the ARA allocated to BI, and holding Aoki out as heading BI. For example:

- In October 2014, Aoki opened a restaurant named KOA, in New York City. *See* Dkt. 145-2. An invitation sent out to members of the Luxury Marketing Council inaccurately referred to Aoki as the "CEO of Benihana, *Inc*." Dkt. 145-3 (emphasis added).

- In 2015, the website for Keiko Aoki Inner Makeup, a company founded by Aoki to providing catering and food sales in New York City, *i.e.*, within BI's territory, *see* Dkt. 145-4; Dkt. 145-41 at 117–118, contained a photograph of a chef wearing the Benihana uniform with the Benihana trademark. *See* Dkt. 145-4 at 3; Dkt. 145-41 at 118. Aoki claims that by 2011, she had stopped "using the website or operating the business at all [by 2011]." Aoki Decl. ¶ 27. The website and the Benihana image on it, however, remained accessible to the public.

- BOT continued to use the URL www.benihanaworld.com, whose use had been an initial basis for BI's letter that inspired this lawsuit. During the pendency of this case, BOT also began using the URL www.benihanaglobal.com. *See* Dkt. 145-41 at 72 (admission by Aoki in testimony to creating a new website, www.benihanaglobal.com, in 2016); Dkt. 145-44 at 89; Dkt. 145-36.

- BOT also registered the URL www.benihanauniverse.com. *See* Aoki Decl. ¶ 4.

Finally, although BOT brought this action in 2014 and had previously been involved in legal disputes with BI, BI alleges, BOT employees were never directed to retain emails, and as a result, emails within the scope of document's demands in this case were lost and/or unavailable for production. *See* Dkt. 121-1 at 3 (BOT admits that Mr. Landolfi "does not have any emails from before 2015"); Dkt. 145-42 at 65 (no instruction not to delete emails); Dkt. 145-44 at 34 (Landolfi testified that he was first asked to review emails for production three weeks before deposition in 2017); *id.* at 45 (Landolfi testified that he deleted business emails); Dkt, 145-43 at 38–40 (due to a server switch in 2016, some emails no longer accessible).

## II.     Applicable Legal Standards Governing Lanham Act Fee Applications

Ordinarily, under the "American Rule," each party must bear its own attorneys' fees. However, where there is "explicit statutory authority," courts may award attorneys' fees. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602–03 (2001); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994).

The Lanham Act, under which BI's counterclaims were largely brought, is such a statute. It provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Therefore, BI may be awarded attorneys' fees in a Lanham Act case if: (1) it is the prevailing party and (2) the case is exceptional. The Court's award of fees must also be reasonable. The Court addresses these respective standards, before applying them to the instant dispute.

### A.     Prevailing Party Standard

Under the Lanham Act, plaintiffs and defendants may qualify as prevailing parties. *See McDermott v. Monday Monday, LLC*, No. 17-CV-9230 (DLC), 2018 WL 1033240, at *2

(S.D.N.Y. Feb. 22, 2018); *cf. CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1651–52 (2016) (plaintiff's and defendant's objectives differ, so "[t]he defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason"). What is required to prevail is that the party be "one who has been awarded some relief by the court." *Buckhannon*, 532 U.S. at 603. "The essence of being a prevailing party is achieving a material alteration of the legal relationship of the parties that is judicially sanctioned." *N.Y. State Fed'n of Taxi Drivers, Inc. v. Westchester Cty. Taxi & Limousine Comm'n*, 272 F.3d 154, 158 (2d Cir. 2001) (quoting *Buckhannon*, 532 U.S. at 604 (quotation marks omitted)).

In this Circuit, a "district court's retention of jurisdiction over [a private settlement agreement] . . . provides sufficient judicial sanction to convey prevailing party status on plaintiffs." *Roberson v. Giuliani*, 346 F.3d 75, 84 (2d Cir. 2003); *see also Scrilla Hill Entm't Inc. v. Dupree*, No. 16-CV-490 (JMF), 2016 WL 5817064, at *3 (S.D.N.Y. Oct. 5, 2016) (applying standard set forth in *Roberson*, 346 F.3d at 84, to Lanham Act case). So does the enforcement of a party's settlement agreement through a court-ordered consent decree. *See Roberson*, 346 F.3d at 84.

**B.   The "Exceptional Case" Standard**

The Supreme Court recently construed the term "exceptional case" in the identically-worded fee-shifting provision of the Patent Act, 35 U.S.C. § 285. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). The Court held: "An 'exceptional' case, then, is simply one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* Relevant factors, the Court stated, include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of

10

compensation and deterrence." *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). Under this standard, a district court is to determine the exceptional nature of a case on a case-by-case basis, "considering the totality of the circumstances." *Id.* at 1756.

BI urges this Court to hold that the standard articulated in *Octane* governs the parallel Lanham Act provision. BI Br. at 3–4. Since *Octane*, numerous judges in this District have so held, applying the *Octane* standard in fees applications under the Lanham Act. *See, e.g., Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*, No. 15 CIV. 6820 (JSR), 2016 WL 8379326, at *1 (S.D.N.Y. Mar. 25, 2016); *VIDIVIXI, LLC v. Grattan*, No. 15 Civ. 7364 (JGK), 2016 WL 4367972 (S.D.N.Y. Aug. 13, 2016); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-0442 (DLC), 2016 WL 1328936, at *2 (S.D.N.Y. Apr. 5, 2016), *aff'd*, 679 F. App'x 33 (2d Cir. 2017); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, No. 14-CV-3419 (JMF), 2018 WL 317850, at *1 (S.D.N.Y. Jan. 8, 2018); *Spin Master Ltd. v. Alan Yuan's Store*, No. 17-CV-7422 (DLC), 2018 WL 3212460, at *9 (S.D.N.Y. June 29, 2018); *see also Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16-CV-2379 (DLC), 2018 WL 1779346, at *16 (S.D.N.Y. Apr. 13, 2018) (applying *Octane* standard to an Anticybersquatting Consumer Protection Act claim, which also contains an identical fee-shifting provision); *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1336 (Fed. Cir. 2017) (concluding "the Second Circuit would hold that, in light of *Octane*, the Lanham Act should have the same standard for recovering attorney's fees as the Patent Act."). The Second Circuit has yet to reach this issue.[4]

---

[4] Although presented with this question twice, the Second Circuit each time has not had a need to reach it, and thus deferred for a future case the construction of the Lanham Act provision. *See Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 17 (2d Cir. 2017); *Penshurst Trading, Inc. v. Zodax L.P.*, 652 Fed. App'x. 10, 12 (2d Cir. 2016).

BOT and Aoki, conversely, urge the Court to adhere to the standard that the Second Circuit, in pre-*Octane* cases, had used to define exceptional cases under the Lanham Act. The Circuit had defined such cases as those involving bad faith, fraud, or willful infringement. *See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003) ("*Patsy's I*"); *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 268 (2d Cir. 2011) ("*Patsy's II*"); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 45 (S.D.N.Y. 2015) (collecting cases).

## C.    Reasonable Fees

Once the Court has decided a party is entitled to fees, it must determine whether the requested fees are reasonable. In resolving the amount of BI's fee award in a prior litigation between BI and BOT, the Court summarized the standards governing "reasonable fees":

> "In reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case. *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997). A claimant is only to be compensated for "hours reasonably expended on the litigation," and not for "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). If the number of hours stated is disproportionate to the work performed, the Court should reduce the stated hours accordingly. *See id.; Seitzman v. Sun Life Assurance Co. of Can.*, 311 F.3d 477, 487 (2d Cir. 2002).

> In determining whether the hours expended by counsel were reasonable, a court may draw on its "first-hand knowledge of [the] litigation and its extensive contact with the parties." *Luciano*, 109 F.3d at 117. Where it is difficult to make line-item reductions to adjust for excessive billing, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (internal quotation marks omitted)); *see N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1145–48 (2d Cir. 1983) (approving percentage reductions to correct for deficiencies in fee application, including "excessive claims for certain tasks" and "inadequate detail in documentation," *id.* at 1142).

*See Benihana Inc. v. Benihana of Tokyo, LLC*, No. 14 CIV. 792 (PAE), 2016 WL 3647638, at *5 (S.D.N.Y. June 29, 2016).

### III.    Application

The Court now applies each of the above standards.

### A.    Is BI a Prevailing Party?

BI is clearly the prevailing party in this action. All that is required is that, upon resolution of the merits of the case, there is a "material alteration of the legal relationship of the parties" that is judicially sanctioned and in favor of the party claiming to prevail. *Roberson*, 346 F.3d 79.

Such is the case here. The broad injunctive relief put in place here is a quintessential form of judicially sanctioned relief. And it materially altered BI and BOT's relationship, forcefully in BI's favor: Broadly covering conduct violative of the Lanham Act, it enjoined BOT from engaging in conduct including, but by no means limited to, the conduct of which BI had complained in its TACC. Indeed, the relief the Court put in place parallels the contents of BI's original prayer for relief in the TACC, save for the fee request and the catch-all request for "other and further relief as the Court deems just and proper." *Compare* Dkt. 132 *with* TACC at 13–14; *see also Economist Newspaper Ltd. v. Am. Economist Inc.*, No. 94 Civ. 3235 (RLC), 1994 WL 455163, at *2 (S.D.N.Y. Aug. 19, 1994) (finding plaintiffs were prevailing party as they "secured a settlement which satisfies all their demands").

The Court has considered the fact that BI agreed contractually, incident to the settlement, to limit discrete areas of its own conduct, (specifically, to forego using words like "global" or "worldwide" in its marketing). That does not make BI any less a prevailing party. The relief to which BI voluntarily agreed had not been sought by BOT in this lawsuit. BOT's initial prayer for relief said nothing of infringing acts by BI, and BOT never pursued any such claim. Rather, BOT invoked BI's actions, in its opening statement at trial, to argue as a matter of equity that,

even if BOT had violated the Lanham Act, an injunction against it should not issue because BI ostensibly had less than fully clean hands. Such an injunction, however, did issue after the settlement in this case. BI got what it asked for; BOT did not: The injunction, notably, enjoins, among other conduct, the very conduct that BOT, in initiating this litigation, originally sought to have declared as non-infringing.[5]

The court order secured by BI is also of a meaningfully different character than the contractual relief that BOT obtained. Were BOT to violate the injunction, it could be found in civil contempt, the penalties for which include fines, an award of costs and attorneys' fees, and potentially civil detention until the injunction is complied with. *See generally* Mary Kay Kane, *Enforcement of and Collateral Attack on Injunctions*, 11A Fed. Prac. & Proc. Civ. § 2960 (3d ed.). This is no hypothetical circumstance. In related litigation, this Court has previously held BOT in contempt for breaching various terms of the injunction as to the Hawaii restaurant that was put in place by an arbitral panel and confirmed and adopted by this Court in 2016. In contrast, were BI to violate a contractual commitment, BOT could not pursue such relief. Its remedy would be to bring a lawsuit sounding in contract, for breach of the settlement agreement.

It is, finally, important to note the very different scales of BI's contractual commitment and the injunction terms that bind BOT. BI agreed to refrain in marketing from using terms that imply BI's global reach, *e.g.*, the phrases "global presence," "all around the globe," "in the world"; from representing that BI owns or operates any BOT restaurants; and from engaging in

---

[5] In any event "the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Instead, "[t]he question of whether a plaintiff is a 'prevailing party' within the meaning of the fee-shifting statutes is a threshold question that is separate from the question of the degree to which the plaintiff prevailed." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir. 1998). It is sufficient that the plaintiff succeeded on "any significant issue in [the] litigation." *Id.*

conduct that "tends falsely to represent, or is likely to confuse, mislead, or deceive" people into thinking that goods and services offered by BI originated from BOT. In the same agreement, BOT and Aoki agreed to reciprocal terms. *See* Dkt. 131 at 1–2. But the injunction against BOT and Aoki goes further. BOT and Aoki are also enjoined, on penalty of contempt as enforceable by a court, from "directly or indirectly infringing" on BI's trademarks; representing that BOT controls the Hawaii territory; representing BOT is the "originator of the unique hibachi cooking style and 'eatertainment' created in the United States"; and implying that BOT operates in New York City and that Aoki is affiliated with BI or Benihana restaurants in BI's territory. *See* Dkt. 132 at 1–2.

In sum, the uni-directional injunctive relief here makes BI the prevailing party. BI obtained substantively all the relief that it sought in this lawsuit. BOT obtained none. The settlement agreement does nothing to alter that reality. While its reciprocal terms contractually binding BI and BOT to refrain from certain species of misleading statements may also play a useful role in guarding against future missteps, this collateral feature cannot obscure that BI achieved its entire litigation objective, and BOT obtained none.

BOT argues that, to qualify as the prevailing party, BI was required to establish its case on the merits. It argues that BI was required to "establish each and every one of its Lanham Act claims by a preponderance of the evidence." BOT Br. at 4; *see also* BOT Br. at 9 ("BI fails to establish its claim for trademark dilution, which required BI to prove that BOT or Ms. Aoki used the Benihana trademarks in a manner likely to cause dilution by blurring or tarnishment.") That is wrong. The case law, including *Roberson* and *Buckhannon, supra,* holds that it is sufficient that a party have obtained the relief it sought via a settlement agreement which a court has

retained jurisdiction to enforce.[6] And to the extent BOT cherrypicks statements from this Court

made in connection with the cessation of trial in favor of the settlement agreement and

injunction, these statements did not suggest that BI was not a prevailing party. The Court instead

identified that as an unresolved issue that the parties had reserved for post-trial briefing. *See*

1/22/18 Tr. at 37.

**B.     Is This Case "Exceptional"?**

This Court joins its many colleagues in holding that the construction of the Patent Act

term "exceptional case" adopted in *Octane* governs the identical term as used in the Lanham Act.

But nothing turns on that here. Whether measured under that standard or the more stringent

standard adopted by the Second Circuit before *Octane*'s guidance, this case is easily held

exceptional so as to support a fee award. In the interest of completeness, the Court applies both

standards.

**1.     The Pre-*Octane* Standard: Bad Faith, Fraud, or Willfulness**

The Second Circuit's pre-*Octane* decisions held that, in Lanham Act cases, a finding of

bad faith, fraud, or willfulness was required to make a case "exceptional" so as to justify a fee

award. *See, e.g., Patsy's I*, 317 F.3d at 221. Applying that standard, courts in this District found

bad faith in a number of contexts. These included where the lawsuit had been "'initiated for

reasons other than a sincere belief in the merits of the underlying claims,' and to 'serve ulterior

business motives.'" *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04CIV7203 (DLC), 2006 WL

---

[6] BOT relies on *N.Y. State Soc. of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331 (S.D.N.Y. 1999). to suggest that a Lanham Act prevailing party must have secured victory on the merits following a presentation of evidence. Whether or not that decision can be fairly so read, any such holding would be inconsistent with the case authority reviewed above. *See also Ritchie v. Gano*, 754 F. Supp. 2d 605, 608 (S.D.N.Y. 2010) (in a Lanham Act case, "a party seeking attorneys' fees must either secure a judgment on the merits or be party to a settlement agreement that is expressly enforced by a court.").

2591478, at *5 (S.D.N.Y. Sept. 11, 2006) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 615 F. Supp. 838, 864 (S.D.N.Y.), *opinion clarified*, 726 F. Supp. 928 (S.D.N.Y. 1985), and *aff'd*, 797 F.2d 70 (2d Cir. 1986)); *see also Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983), *aff'd* 742 F.2d 1437 (2d Cir. 1984) (awarding attorneys' fees because "[t]here is a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy"). *But see OPA (Overseas Pub. Ass'n) Amsterdam BV v. Am. Inst. of Physics*, 986 F. Supp. 242, 245 (S.D.N.Y. 1997), *aff'd sub nom. Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 166 F.3d 438 (2d Cir. 1999) ("We know of no case in which a court has concluded that fees should be awarded although the suit itself was not frivolous because of plaintiff's ulterior motivation in instituting the action.").

This case comfortably fits that standard. It is apparent that BOT both initiated and later defended this lawsuit—and engaged in the underlying conduct that both its claims and BI's predictable counterclaims put at issue—not out of a good faith attempt to vindicate legitimate rights. Instead, the record makes clear that BOT engaged in and then defended indefensible conduct to advance an ulterior motive.

More than that, this case contains the rarest of direct evidence of bad faith: an admission to this effect by the lawyer who brought this lawsuit on behalf of a party whose conduct is claimed to have been in bad faith. The Court fully credits the in-court testimony of Richard Feldman, BOT's former outside counsel. Mr. Feldman credibly testified that Ms. Aoki's express strategy had been to bring suits "whether there was merit" to them or not as part of "her overall strategy to force BI to expend large counsel fees contesting her unreasonable actions in courts in New York, Delaware, and Hawaii, so that they might entertain discussions to have BOT purchase the assets of BI." Feldman Tr. at 7. And, in supervising the assembled BI/BOT

lawsuits before it during the past five years, this Court has seen corroboration of Mr. Feldman's account. These lawsuits have exposed the Court to a range of egregious violations of governing agreements (the ARA; the Hawaii franchise agreement) by BOT. Two of these cases have resulted in fee awards against BOT. One, involving breaches of the injunction governing practices at the Hawaii restaurant that an arbitral panel put in place and which this Court confirmed, resulted in a finding of contempt.

The conduct of BOT and Ms. Aoki in this lawsuit fits to a tee Mr. Feldman's description of her litigation strategy of pursuing unjustified conduct, claims, and defenses in an effort to win a long game of attrition. In advance of the bench trial in this case, the Court carefully reviewed virtually all the documentary evidence that was to be offered at trial, and which was submitted in connection with the joint pretrial order. These materials were then reviewed, in large measure, during counsel's opening statements. While the Court maintained an open mind for trial, BOT's conduct as reflected in these materials unavoidably reflected what appeared to be transparent breaches of the Lanham Act. And given the opportunity to defend such conduct in his opening statement, BOT's counsel did not articulate a coherent defense. Indeed, it strongly appeared to the Court that the lopsided strength of counsel's opening statements—BI's was compelling, facilitated by a Power Point that powerfully marshalled BOT's serial false and misleading statements—catalyzed BOT's ensuing capitulation and the settlement that was arranged at the recess that immediately followed.

Further, BOT and Ms. Aoki's conduct after this lawsuit was initiated accords with Mr. Feldman's account of her game plan to drive up BI's litigation costs even by means of legally unjustifiable conduct. As compellingly alleged by BI and as reflected in materials that the Court was provided incident to the trial, during the discovery period in this case, BOT committed new

Lanham Act violations. These required BI to amend its counterclaims and to monitor BOT's and Ms. Aiko's websites and other public statements during this litigation. BOT and/or Ms. Aoki launched, for example, new websites containing misleading information or images that blatantly trenched on BI's rights. For example, as of 2015, Ms. Aoki's website for her New York City-based Inner Makeup company contained a photograph of a chef in the Benihana uniform, whereas Ms. Aoki and BOT had no rights to use such images in BI's territory, let alone imply an affiliation of her company with BI. Ms. Aoki's defense during her deposition was that the website had not been functional in 2015, but that statement was incredible, insofar as counsel was able to access the website at that time. *See* Aoki Tr. at 120; Dkt. 145-4. Further, aware of BI's counterclaim to the effect that websites like BOT's www.benihanaworld.com that asserted a global reach for BOT were misleading given BOT's limited territorial purview under the ARA, BOT and Aoki in mid-litigation launched (or registered), without credible explanation, websites with similar statements and/or URL terms—*e.g.*, substituting "world" for "global" and "universe." *See* Dkt. 145-36; Aoki Decl. ¶ 4. BOT did not seriously defend this conduct on the merits. Nor did it claim to have relied on legal advice in doubling down on these challenged practices.

Similarly, in October 2014, after this lawsuit was underway, a press release for Aoki's New York City restaurant, KOA stated the Benihana restaurant chain "now [has] over 100 locations in 15 countries." Dkt. 145-2. Aoki was then on notice that BI had asserted that BOT's use of the virtually identical claim that it "has more than 100 locations worldwide, in more than 20 countries" as early as March 2014, Answer ¶ 14, breached the Lanham Act, in that BOT had far fewer such restaurants, and was instead trying to capitalize on BI's operations, and in a market (New York City), no less, which the ARA had allocated exclusively to BI. Later, an

invitation Aoki sent to members of the Luxury Marketing Council announcing the opening of KOA referred to Aoki as the "CEO of Benihana, Inc." Dkt. 145-3; *see also* Aoki Tr. at 113–14 (evading answering whether she was "concerned that you held yourself out . . . as the CEO of Benihana, Inc."). That statement was untrue—Ms. Aoki had no role whatsoever in connection with BI. Such conduct, too, obliged BI and its counsel, during the lengthy period between the initial complaint and trial, to constantly monitor for continued infringements along these lines, incurring further legal fees and costs.

Central to the Court's finding of bad faith is Feldman's extraordinary testimony, which literally attributes to BOT head Aoki an intention to pursue frivolous litigation with the intent of driving up its adversary's costs. Ms. Aoki's self-serving denial, made in a declaration that (as a result of the settlement) was not subject to testing at trial, was not credible. The Court therefore finds clear bad faith on the part of BOT and Aoki. Even under the pre-*Octane* standard, that bad faith would qualify as exceptional. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07-CV-4018 (JS)(ARL), 2016 WL 126377, at *4 (E.D.N.Y. Jan. 11, 2016) (finding improper purpose where plaintiff's CEO "stated that he wanted to file 'an enormous, fabulous lawsuit,' noting that it would be 'very good' for [plaintiff]"); *see also Playboy Enters., Inc. v. Asiafocus Int'l, Inc.*, No. CIV.A. 97-734-A, 1998 WL 724000, at *9 (E.D. Va. Apr. 10, 1998) (finding willfulness and bad faith "in initiating and continuing their infringing activities despite notice from [plaintiff] and the commencement of this litigation").[7]

---

[7] In light of this holding, the Court has no occasion to address, as a separate ground asserted by BI as justifying a fee award on account of bad faith, BOT's failure to preserve documents. *See* BI Br. at 16–21. The conduct addressed above alone satisfies the bad-faith standard. The Court was, however, dismayed by BOT's extreme inattention to its document-preservation duties, such that, had the Court been compelled to consider in detail this category of conduct, it is entirely possible that the Court would have found that it, too, evinced bad faith making the case extraordinary.

### 2.    The *Octane* Standard

The Court alternatively analyzes BI's fee application under the more capacious *Octane* standard.  The totality of the circumstances, including the demonstrated bad faith of the non-prevailing party, easily justifies a fee award under that standard, too.  This case indeed stands out from the others.  For the reasons reviewed above, the underlying violations here of the Lanham Act were blatant, and BOT and Aoki then brought and pursued this case in bad faith with the admitted ulterior goal of driving up BI's legal expenditures, all the while engaging in further violative conduct.  *See, e.g.*, Feldman Tr. at 5, 7.  The factor noted by *Octane* of objective unreasonable conduct also supports a fee award here.  So, too, does the factor of deterrence.  Indeed, given the broader pattern of BOT's conduct as exposed by the related litigations before this Court and the arbitral panel that heard evidence of BOT's breaches of the licensing agreement governing the Hawaii restaurant, the need to deter BOT from further excesses is compelling.  *See, e.g.*, *Gust, Inc. v. AlphaCap Ventures, LLC*, 226 F. Supp. 3d 232, 245 (S.D.N.Y. 2016), *reconsideration denied*, No. 15-CV-6192 (DLC), 2017 WL 2875642 (S.D.N.Y. July 6, 2017) (deterrence prong weighed in favor of finding exceptionality in part in light of "the number of substantially similar lawsuits filed within a short time frame . . . part of a predatory strategy aimed at reaping financial advantage from the inability or unwillingness of defendants to engage in litigation when faced with even frivolous patent lawsuits."); *see Benihana Inc. v. Benihana of Tokyo, LLC*, 2017 WL 6551198 (S.D.N.Y. 2017) (awarding fees to BI after finding BOT in civil contempt for failure to comply with Hawaii injunction).  The *Octane* factor of compensation also supports such an award.  As developed further in the ensuing section, BI was required to expend significant resources investigating BOT's breaches, and defending against claims brought by BOT and bringing its own counterclaims against BOT and Aoki.  *See VIDIVIXI, LLC*, 2016 WL 4367972, at *4 (awarding attorneys' fees under *Octane* where

"Lanham Act claims were objectively unreasonable [and] motivated by a competitive ploy");

*Cognex Corp. v. Microscan Sys., Inc.*, No. 13-CV-2027 (JSR), 2014 WL 2989975, at *4

(S.D.N.Y. June 30, 2014) (awarding attorneys' fees under *Octane*, in patent case, in part where

defendants engaged in "unreasonable litigation tactics that have wasted the Court's time and

have required plaintiffs to expend significant resources").

For all these reasons, this case qualifies as an "exceptional case" within the meaning of

the *Octane* standard. BI is entitled to an award of reasonable attorneys' fees and costs.

### C. What Award of Fees and Costs is Reasonable?

The Court considers next the proper amount of the award of fees and costs. In two prior

lawsuits between BI and BOT, referred to herein as *Benihana Fees I* and *Benihana Fees II,* the

Court has ordered BOT to pay such an award.[8] As in those cases, BI here seeks an award

reflecting the fees and costs incurred in this litigation by two law firms: BI's principal counsel,

Miami-based Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("Stearns Weaver"),

and its local counsel in New York, Clarick Gueron Reisbaum LLP ("Clarick Gueron"). With

respect to Stearns Weaver, BI seeks an award of $1,095,515 in fees and $68,448.52 in costs.

With respect to Clarick Gueron, BI seeks an award of $47,172.50 in fees and $1,768 in costs.

The total requested award is thus $1,212,904.02.

---

[8] The first fee application arose from litigation brought by BI aimed at enforcing—in advance of an arbitration—the terms of BI's license agreement with BOT giving BOT the right to operate the Benihana restaurant in Hawaii. BI requested fees and costs totaling $171,174.25; the Court awarded BI $118,860.26. *See Benihana Inc. v. Benihana of Tokyo, LLC*, No. 14 CIV. 792 (PAE), 2016 WL 3647638 (S.D.N.Y. June 29, 2016) ("*Benihana Fees I*"). The second fee application arose from the arbitration in which BI claimed material breaches by BOT of the license agreement and at which BOT challenged BI's termination of that agreement, and from follow-on litigation to confirm or vacate the arbitrators' award. BI requested fees and costs totaling $814,185.85; the Court awarded BI $634,680.04. *See Benihana Inc. v. Benihana of Tokyo, LLC,* 2017 WL 6551198 (S.D.N.Y. 2017) ("*Benihana Fees II*"). The parties currently have a fourth fee application pending. *See* 16 Civ. 3800, Dkt. 65.

The Court considers first the request for fees. BOT does not claim that the billing rates that BI proposes be used for any of BI's timekeepers at either law firm are unreasonable. And on its independent review, the Court finds these rates reasonable. The rates are broadly consistent with rates previously approved by the Court for what are, overwhelmingly, the same timekeepers in prior litigations between these parties (with modest and reasonable upward adjustments in rates for the years 2017 and 2018, which have not been the subject of prior fee applications), *see, e.g., Benihana Fees II*, 2017 WL 6551198, at *4; the rates fall comfortably within the range of fees commonly approved in this District for estimable counsel and their staff in complex commercial and intellectual property litigation, *see id.* at *5; and the rates reflect the rates which BI has in fact paid for the work of these outside counsel and staff.[9]

The more substantial question is the extent to which the hours worked by these personnel were reasonably expended, consistent with the standards summarized above.

As to that issue, BI takes the position that all reported hours for which it is seeking recompense were reasonably incurred, explaining the various chapters of this four-year litigation and how the work its outside counsel did was targeted to valid needs of the client and case. *See, e.g.*, Fein Decl. ¶¶ 5-14; Gueron Decl. ¶ 11. BI further notes that, before it submitted its request

---

[9] During the four-year period of this litigation, the hourly rates charged for the Stearns Weaver attorney timekeepers with respect to whose work BI seeks a fee award on this matter were: for shareholder Alan Fein, between $625 and $795; for shareholder Joshua Munn, between $450 and $580; for shareholder Andrea Nathan, between $325 and $500; for shareholder Jenea Reed, $285 to $460; and for associate Veronica de Zayas, between $375 to $400. The hourly rate charged by a member of the firm's in-house multi-media staff was $250. The hourly rate charged for the work of each of the three Stearns Weaver legal assistants on this matter, and for the work of an in-house technology and discovery database specialist, was $120. *See* Dkt. 135 ("Fein Decl.") ¶¶ 15–27. The hourly rates charged for the Clarick Gueron attorney timekeepers were: for partner Nicole Gueron, between $595 and $640; for partner Isaac Zaur, $465; for associate Courtney Milianes, between $340 and $395; and for associate Melissa Holsinger, $435. The hourly rate charged for the work of two of the firm's legal assistants was $195. *See* Dkt. 136 ("Gueron Decl.") ¶¶ 12–18.

for a fee award, it eliminated from that request certain time entries. These included (1) time worked on enforcement efforts that predated, and instigated, BOT's filing of the Complaint in this case, *see* Fein Decl. ¶ 5; (2) at the Court's direction, time worked after January 22, 2018 (*i.e.*, time spent on the fee request), *see id.* ¶ 14; Gueron Decl. ¶ 11; and (3) time worked that was not clearly undertaken in connection with this specific litigation, as opposed to another contemporaneous litigation between BI and BOT, *see* Gueron Decl. ¶ 9.

BOT, for its part, urges the Court, in the event of a fee award, to "substantially reduce[]" the award below the amount requested by BI. BOT urges the Court to prune the time that BI counsel spent on certain matters. Specifically, BOT identifies as warranting expungement from consideration of the fee award: (1) work preparing those of BI's counterclaims which involved the Benihana restaurant in Hawaii, because the Court had dismissed these counterclaims in favor of arbitration; (2) work opposing BOT's motion to compel arbitration of the claims on which the Court granted that motion, *i.e.*, claims that involved the Hawaii restaurant; and (3) BI's work that, as recorded on timesheets, was "vague or otherwise inconsistent" or reflected block billing. *See* Dkt. 139 at 17–18. BOT's discussion of the bases for reducing an award, however, was quite brief and generally put. It occupied a bare page and a half of its memorandum of law, *see id.*, was unsupported by any declaration attempting to parse BI's billing records, and did not identify any particular BI time entry as problematic. BOT urged that, if there were a fee award, that the Court should reduce the award by at least 50% from that requested. *Id.* at 17.

Consistent with its independent obligation to assure that any fee award is well justified, reasonable, and proportionate, the Court has closely reviewed the record of this case, informed by its familiarity both with this case and the adjacent litigations between BI and BOT. The Court reviewed all filings, conference and argument transcripts, submissions, orders, and decisions in

this case. This record spans January 2014, when BOT filed its Complaint, through January 2018, when the parties, shortly after opening statements at trial, reached a settlement. The Court also closely reviewed the billing records of all BI timekeepers during this period. Finally, the Court reviewed BI counsel's affidavits, which helpfully situated the activities described in counsels' time entries in the context of the litigation work then being performed.

Subject to modest exceptions reviewed below, the Court's overall assessment is that the legal work and advocacy of BI's outside counsel on this matter during this four-year period was properly undertaken, reasonable in scope, executed with agility and skill, and ultimately highly successful. Importantly in considering BI's fee request, the litigation occupied a number of chapters, each of which justified sustained work by multiple timekeepers. In brief:

The case was initiated by BOT, seeking declaratory relief, essentially to the effect that there was no infringement. *See* Dkt. 1. This required BI to research and formulate its answer and extensive counterclaims. *See* Dkt. 7.

Following the filing of BI's counterclaims, there was litigation on BOT's motion to dismiss the counterclaims in favor of compulsory arbitration and for a stay of this litigation. This resulted in the Court's compelling arbitration on a subset of BI's counterclaims, while retaining jurisdiction over the remainder. *See* Dkt. 42.

Discovery on BI's counterclaims then began; was stayed pending the outcome of the Hawaii arbitration; and then, after the Hawaii arbitration concluded, resumed in earnest. Discovery occupied substantial time and effort, reflecting the diversity and splay of the Lanham Act violations alleged by BI. Further, as discovery unfolded, additional Lanham Act violations came to BI's attention. BI, with leave, amended its counterclaims. *See e.g.*, Dkt. 87 (amended counterclaims). These, in turn, generated, in addition to further discovery, a motion to dismiss

by BOT. *See e.g.*, Dkt. 104 (April 19, 2017 decision denying BOT's motion to dismiss the TACC).

Discovery and pretrial work intensified in fall 2016, after an August 2016 conference aimed at exploring a global settlement between BI and BOT did not bear fruit. *See* Dkt. 93 (November 3, 2016 case management plan). The bulk of outside counsel's time on this matter was spent in late 2016, 2017, and January 2018. During this period, counsel completed discovery, made extensive pretrial submissions including a detailed joint pretrial order, proposed findings of fact and conclusion of law, and briefed a motion *in limine* regarding BI's substantial claim of spoliation. *See e.g.*, Dkt. 122 (joint pretrial order); *see also* Dkts. 120–121, 123–124. During the latter part of this period, as the time sheets reflect, counsel were actively engaged in trial preparation.

On January 22, 2018, the bench trial commenced. In preparation for trial, the Court had reviewed in detail the parties' documentary trial exhibits, which for BI were extensive and compelling. BI's opening statement at trial in turn drew upon and marshalled extensive documentary evidence and deposition testimony that counsel had gleaned through discovery. The case then settled, with BOT's decision to capitulate no doubt informed by the strength of the case BI had just showcased (and perhaps by an unwillingness to expose Ms. Aoki to courtroom cross-examination).

Finally, throughout the four-year period, the docket reflects many recurrent activities that drew materially on BI counsel's time. These included settlement discussions and conferences, as encouraged by the Court and the assigned Magistrate Judge, case management conferences and arguments, and quotidian but nonetheless important correspondence.

As the above case history reflects, this litigation—in its duration, complexity, pitch, and importance to the parties—amply justified sustained and inherently costly legal work on the scale commissioned and paid for by BI. Centrally important, too, to the Court's assessment that a substantial fee award is merited is the fact that this case reached trial and only settled during trial. BOT's decision not to settle until then—despite acceding to terms that gave BI effectively the full injunctive relief it sought—necessarily obliged BI counsel to devote weighty resources to trial preparation. BI's billing records reflect that its outside counsel indeed devoted extensive— but by no means excessive—time to assuring an orderly, crisp, and convincing trial presentation. The Court's review of these records further reflects, in the main, fidelity to sound practices. With relatively few exceptions, these records ably describe the work the timekeeper performed so as to permit a reviewer to make an intelligent assessment. They also overwhelmingly reflect that the work performed was targeted to relevant projects, most especially the trial that—for the final year or so of counsels' work—loomed ahead.

The Court accordingly proceeds from the premise that the fees incurred by BI in successfully litigating this matter are compensable. The Court's review, however, has identified certain discrete considerations that together merit making a percentage deduction from the requested fees. Briefly, these are as follows:

- *Deficient billing practices*: In its two prior fees decisions, the Court noted certain deficient billing practices on the part of BI's lead counsel, Alan H. Fein, Esq., of Stearns Weaver. These included the practice of rounding daily billable hours to the nearest hour—*i.e.*, not billing in tenths of an hour—and the practice of block-billing time. *See, e.g.*, *Benihana Fees I*, 2016 WL 3647638, at *6; *Benihana Fees II*, 2017 WL 6551198, at *5–*7. The Court's review of Mr. Fein's timesheets in

this case reflects that, following the Court's June 2016 fees decision, he, commendably, reformed his billing practices. *See Benihana II*, 2017 WL 6551198, at *5 (noting better billing practices after June 2016). Nevertheless, because this litigation dates to January 2014, the assembled Stearns Weaver time records reflect 30 months of billing entries in which these practices (particularly rounding) still appear. Because Mr. Fein's time accounts, by far, for the most billable hours and the highest fees, an adjustment for these practices is consequential.

- *Staffing choices*: The Court's review reveals a number of occasions in which three or more Stearns Weaver timekeepers billed for attending common meetings. In addition, four of the five Stearns Weaver attorneys who billed time on this matter were highly experienced lawyers whom the firm denotes "shareholders." And the overall bills to BI lopsidedly reflect such shareholder-heavy work, with the most senior lawyer, Mr. Fein, whose billing rate was by the far the highest of the shareholders, expending by far the most hours on this matter. (Mr. Fein spent 723.8 hours on this matter, followed by fellow shareholders Mr. Munn, at 515.40, Ms. Reed, at 371.20, and Ms. Nathan, at 305.60; associate Ms. de Zayas worked 60.60 hours.) To be sure, this matter surely required at all stages the expenditure of substantial time by senior lawyers. And Mr. Fein's knowledge of the controversy, client, adversary, and governing agreement was unparalleled. Nonetheless, a client concerned about cost could reasonably insist that such legal work such as the drafting of pleadings and briefs, and the conduct of discovery, be more heavily concentrated among junior timekeepers. Relatedly, the Court also

noted heavy billings on the review and preparation of BI's counterclaims and amended counterclaims. Although all these billing practices are proper and a matter of client choice—BI was at liberty to pay for such staffing decisions and is rightly pleased with the outcome obtained—a meaningful downward adjustment is warranted to assure that the fees shifted to BOT are no higher than minimally reasonable.

- *BI's Hawaii counterclaims and opposition to motion for arbitration*: As noted, BI brought a range of counterclaims. Some related to the Hawaii restaurant; others, to broader BOT marketing practices. BOT moved to compel arbitration of these counterclaims, and BI vigorously opposed this motion *in toto*. But while BOT's motion lacked merit to the extent it related to counterclaims not involving the Hawaii restaurant, BOT's motion was meritorious to the extent that it sought arbitration of BI's counterclaims relating to that restaurant. The Court held that the license agreement that governed that restaurant on its face clearly allowed *either* party to elect arbitration, such that BOT's motion to compel arbitration on the counterclaims involving Hawaii marketing practices was clearly meritorious. The Court firmly rejected BI's contrary argument that the license agreement's arbitration clause was overcome when one party elected to pursue litigation. *See* Dkt. 42. While BI fairly notes that some of its arguments on the motion would have been made anyway given its valid opposition to arbitrating the non-Hawaii counterclaims, given BI's defeat as to the Hawaii-based claims, some reduction of fees is warranted to reflect the time spent briefing and arguing this incorrect position. Relatedly, the Court will reduce BI's compensable time to reflect work

spent developing the Hawaii counterclaims. Because these counterclaims were ultimately not litigated in this forum but instead in the arbitration for which the Court assessed fees in *Benihana Fees II*, the Court regards such work as outside the scope of a proper fee award here.

- *Time spent on abandoned damages claims*: BI initially pursued claims for damages, but, approximately one year before trial, abandoned those claims, pursuing only equitable relief. Although BI's time sheets do not reveal extensive time spent on issues relating uniquely to damages, some adjustment is warranted to reflect BI's abandonment of those claims.

Based on its close review, the Court's assessment is that these considerations, which primarily implicate the work of Stearns Weaver, together merit a 25% reduction in the fee award sought with respect to the work of that firm. The Court therefore will reduce the fee award attributable to the work of Stearns Weaver from the $1,095,515 requested to $821,635.25. These considerations have more limited application, however, to the work of BI's local counsel Clarick Gueron. The Court will, however, trim the fee award requested for that firm by 5%, to account for such factors as review by Clarick Gueron of work on projects that the Court has held non-compensable. The Court therefore will reduce the fee award attributable to the work of Clarick Gueron from the $47,172.50 requested to $44,813.47. The total fee award is thus $866,448.72. The Court has considered carefully whether a greater fee reduction than those applied here is merited. The Court's considered judgment, based on its familiarity with this litigation and its close review of billing records, is that no greater reduction is warranted.

Finally, as to costs, BOT has not raised any objection specific to BI's request for the reimbursement of costs. The Court nevertheless has closely reviewed the expenditures in

question, as incurred by both law firms. As in the earlier fees decisions, the Court finds these expenditures reasonable and sufficiently substantiated to be compensated. The Court therefore will award BI $70,216.52 in costs.

## CONCLUSION

For the foregoing reasons, the Court awards Benihana, Inc. reasonable attorneys' fees and costs, in the total amount of $936,665.24, representing $866,448.72 in fees and $70,216.52 in costs.

The Clerk of Court is respectfully directed to enter a judgment.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge


Dated: July 25, 2018
New York, New York