USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/8/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
BENIHANA OF TOKYO, LLC, as successor to :
BENIHANA OF TOKYO, INC., :
: 14 Civ. 224 (PAE)
Plaintiff and :
Counter-Defendant, : OPINION & ORDER
:
:
-v- :
:
:
BENIHANA, INC., as successor to BENIHANA :
NATIONAL CORP., and NOODLE TIME, INC., :
:
:
Defendants and :
Counter-Plaintiffs, :
:
-v- :
:
:
KEIKO AOKI, :
:
Counter-Defendant. :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This decision resolves an application for attorneys' fees and costs incurred during the appellate phase of a Lanham Act lawsuit.

**I.    Factual Background**

    **A.    The Award of Fees and Costs to BI Under the Lanham Act**

On July 25, 2018, this Court issued a decision resolving a motion by defendant and counter-plaintiff Benihana, Inc. ("BI"), for an award of fees and costs from plaintiff and counter-defendant Benihana of Tokyo, LLC ("BOT"), under § 1117 of the Lanham Act, 15 U.S.C. § 1117(a). *See Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2018 WL 3574864 (S.D.N.Y. July 25, 2018) ("*Fees Decision*"); *see also* Dkt. 153. The Court incorporates by reference here the background and analysis set out in that decision. As recapped

briefly in the *Fees Decision*, the Lanham Act dispute was the latest in a series of litigations between BI and BOT in recent years, a number of which centered in this Court.

Since a 1995 agreement with BOT, BI has held the right to operate Benihana restaurants and to own and use Benihana trademarks in the United States, Central America, South America, and Canada ("the Territory"). *Fees Decision*, 2018 WL 3574864, at *2. BOT held these rights outside the Territory. *Id.* Under a license agreement with BI that has been the subject of numerous of the BI / BOT lawsuits, BOT operated a Benihana restaurant in Honolulu, Hawaii. *Id.*

In this litigation, BI claimed a range of glaring Lanham Act violations by BOT. These largely consisted of website statements by BOT that misleadingly stated or implied that BOT owned or operated the 77 Benihana restaurants, and owned the Benihana trademarks, within the Territory. *See id.* BI sought injunctive relief. *See id.* at *3. After discovery and motions practice, the case proceeded to a bench trial, which began on January 22, 2018. *Id.* The case settled during the first day of the trial. *See id.* The Court entered an order embodying the parties' settlement terms. *Id.* In language tracking the relief that BI had sought, the settlement enjoined BOT and its chief executive, Keiko Aoki, from infringing on BI's Benihana trademarks. *Id*.

On February 12, 2018, BI moved for attorneys' fees and costs, which it had reserved the right to do. *Id.* at *4. In the *Fees Decision*, the Court granted that motion. *Id.* at *16. The Court noted that under the Lanham Act, a court "in exceptional cases may award reasonable attorney fees to the prevailing party," 15 U.S.C. § 1117(a). *Fees Decision*, 2018 WL 3574864, at *5. The Court held both that BI had been the prevailing party and that the case had been exceptional.

2

As to the former, the Court held that BI had been the prevailing party, in that the injunctive relief entered pursuant to the mid-trial settlement had paralleled the full relief BI sought in its original prayer for relief, such that the relief entered, although taking the form of a settlement, had been tantamount to a full victory for BI at trial. *See id.* at *7–9.

As to the latter, the Court noted that there were two potentially applicable tests for an "exceptional case." *See id.* at *6–7; *see also id.* at *9–12. The first test, the use of which BOT advocated, was that used in the Second Circuit before the Supreme Court's decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014). *See Fees Decision*, 2018 WL 3574864, at *6–7. *Octane* interpreted the Patent Act's fee-shifting provision, 35 U.S.C. § 285, which is identical to the fee-shifting provision of the Lanham Act. *See Octane*, 572 U.S. at 553– 54. Under the "pre-*Octane*" standard, a party seeking fees was required to show bad faith, fraud, or willful infringement. *Fees Decision*, 2018 WL 3574864, at *7; *see also id.* at *9. *Octane*, however, construed the term "exceptional case" more broadly, as "simply one that stands out from the others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which it was litigated." *Octane*, 572 U.S. at 554. *Octane* held that a district court was to determine a case's exceptional nature of a case on a case-by-case basis, "considering the totality of the circumstances"; in this test, the Court stated, relevant factors include "frivolousness, motivation, objective unreasonableness, both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (citation omitted). Although the Second Circuit had yet to hold that the *Octane* test applied to Lanham Act cases, BI urged the Court to hold that it did. *See Fees Decision*, 2018 WL 3574864, at *6.

The Court agreed with BI that the *Octane* test applied to § 1117(a) of the Lanham Act. *Id.* at *9. But, the Court held, the circumstances qualified as exceptional under either test, warranting an award of fees. *Id.* Under the pre-*Octane* test, the Court held, BOT (which had initiated this litigation but later dropped its claims) had engaged in bad faith. *See id.* at *9–11. Indeed, BOT's prior counsel had admitted in sworn testimony before the Court that Aoki had instructed him to bring meritless litigation to drive up BI's fees. *See id.* at *10. Further, BOT had also persisted in violating the Lanham Act after the litigation was underway. *See id.* Under the *Octane* standard, the Court held, this case stood out as exceptional because of BOT's demonstrated bad faith, the blatant quality of BOT's underlying Lanham Act violations, and the ongoing nature of these violations. *See id.* at *11. Further, the Court held, given the admission by counsel that BOT had deliberately pursued meritless claims here (and in other litigations and arbitrations with BI), the factors of deterrence and compensation strongly supported a fee award. *See id.* at *11–12.

The Court, finally, found that an award of $936,665.24 in fees and costs from BOT to BI was reasonable. *Id.* at *16. The Court approved the hourly rates of all relevant timekeepers as reasonable. *Id.* at *12. As to the hours for which BI sought compensation, upon close review of time records, the Court, for various reasons, pruned by 25% the hours worked by BI's principal outside law firm, Miami-based Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("Stearns Weaver"), and by 5% the hours worked by BI's local counsel, Clarick Gueron Reisbaum LLP ("Clarick Gueron"). *Id.* at *16. This yielded a fee award of $866,448.72. *Id.* The Court approved in its entirety BI's request for an award of $70,216.52 in costs. *Id.*

**B.     BOT's Appeal**

BOT appealed. On June 21, 2019, after briefing and argument, the Circuit affirmed in a brief summary order, stating that it did so "for substantially the reasons set forth in the district

court's thorough and well-reasoned opinion." *Benihana of Tokyo, LLC v. Benihana Inc.*, 771
F. App'x 71, 72 (2d Cir. 2019). The Circuit affirmed the determinations both that BI was the
prevailing party and that the case presented "exceptional circumstances." *Id.* The Circuit added
only that, as to the latter standard, it had held, following the onset of BOT's appeal, that the
*Octane* standard applied to fee litigation under the Lanham Act. *See id.* (citing *Sleepy's LLC v.
Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018)).

### C. BI's Motion for Appellate Fees and Costs

On July 29, 2019, BI timely moved before this Court for an award under § 1117(a) for its
appellate fees and costs, and for the fees and costs it expended in connection with related
collection, bond, and stay issues incurred before BOT's appeal. *See* Dkt. 174 ("BI Mem."); Dkt.
175 (declaration of Alan H. Fein, Esq.) ("Fein Decl."). Specifically, BI sought (1) $302,702.50
for its appellate work including reviewing BOT's brief, preparing its brief, and participating in
mediation as required by the Second Circuit; (2) $21,925 for analysis of BOT's reply brief and
its follow-on efforts to supplement the appellate record; (3) $96,105 for preparation and
presentation of oral argument before the Circuit; and (4) $37,153 for its work litigating appellate
bond, stay, and collection issues. *See* BI Mem. at 7.

On August 12, 2019, BOT submitted a memorandum of law opposing such an award.
*See* Dkt. 176 ("BOT Mem."); Dkt. 177 (declaration of Jeremy W. Schulman, Esq.) ("Schulman
Decl.") On August 19, 2019, BI submitted a reply. *See* Dkt. 178 ("BI Reply"); Dkt. 179 (reply
declaration of Alan H. Fein, Esq.) ("Fein Reply Decl.").

## II. Discussion

BI's motion and BOT's opposition raise two questions: (1) whether BI is entitled to an
award of fees and costs for its successful appellate defense of the Court's fee award; and (2) if

5

so, what the reasonable amount is of such an award. Although contesting the first issue, BOT predominantly challenges the reasonableness of the size of the fee award BI seeks.

### A. BI's Entitlement to Fees

As a threshold matter, a district court retains jurisdiction following an appeal to resolve ancillary matters, including fee applications. *See Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225–26 (2d Cir. 2004). BOT does not contend otherwise.

On the merits, the Lanham Act permits an award of full costs and reasonable attorneys' fees to the prevailing party, including the fees and costs incurred on appeal. *See* 15 U.S.C. § 1117(a); *JCW Invs., Inc. v. Novelty, Inc.*, 509 F.3d 339, 341 (7th Cir. 2007). The same standard, from § 1117(a), applies to an award of appellate fees as to fees at the district court level.

That standard is easily met here. The Court has reviewed the appellate briefs filed at the Second Circuit and reviewed audiotape of the oral argument. As this review reflects, BOT put at issue the full spectrum of legal and factual determinations made by this Court in the *Fees Decision*. BOT argued that this Court had erred in finding BI the prevailing party; that the pre-*Octane* standard should apply in cases seeking fee awards under § 1117(a) of the Lanham Act; that the Court had abused its discretion in finding that the case involved exceptional circumstances under either the pre-*Octane* or *Octane* standards; that BOT had had credible defenses to BI's Lanham Act claims and in fact had been in as strong a litigating position in the district court as BI; and that the Court had abused its discretion in determining that BI's fees, as reduced in the fee award, were reasonable. *See generally* No. 18-2328-cv, Dkt. 35 ("BOT App. Br.") (2d Cir. Nov. 26, 2018).

In reprising all these issues, BOT's appeal required BI to address them and the Second Circuit to resolve them. The Circuit ultimately did so by adopting by reference this Court's

6

reasoning and rulings, while noting that, following the onset of the appeal, it had held that the *Octane* standard applied to fee applications under § 1117(a) of the Lanham Act.

In light of these facts, BI was, unavoidably, the prevailing party on appeal. And for the same reasons as the district court litigation involved "exceptional circumstances" justifying a fee award under § 1117(a), so too did BOT's appeal, reprising, as it did, all issues resolved below.

Indeed, an award of reasonable appellate fees for BI's work in defending this Court's Lanham Act fee award on appeal is particularly warranted insofar as it would serve the ends of both compensation and deterrence, both of which *Octane* recognized could justify fee awards in particular circumstances.

As to compensation, an award making BI whole for its work in a case that this Court and the Second Circuit have found to entail exceptional circumstances would further the purpose of the statutory fee authorization. It would do so by assuring that BI not bear the reasonable costs incurred in prevailing on the merits. And it would assure that the effective rate for BI's counsel's work underlying the existing fee award not be watered down by uncompensated appellate work. *See Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979).

And as to deterrence, BOT's track record of fomenting vexatious litigation against BI equally favors a fee award on appeal as it did in the district court. As noted, the BOT's outside counsel who initiated this litigation has since testified that BOT CEO Aoki's articulated long-term legal strategy towards BI (including in this litigation) has been to drive up BI's legal bills by pursuing groundless claims and arguments. An appellate fee award serves a vital purpose in deterring future abuse. BOT's sustained and admitted strategy of breaching its contractual obligations to BI and then defending blatant breaches in court, as repeatedly reflected in a series of litigations before this Court and elsewhere, is exceptional. Such conduct merits an appellate

7

fee award here in the interests of assuring that BOT is deterred from recidivating. Such an award will convey to BOT that, in the event of future vexatious litigation on its part, it will bear the burden of covering the reasonable fees and costs incurred by BI—whether incurred in the district court or on appeal, and whether incurred in litigating the merits or follow-on fee-shifting proceedings within the scope of a fee-shifting statute.

BOT's arguments against an appellate fee award are easily put aside. BOT depicts BI as claiming that appellate fees are automatically warranted under the Lanham Act. *See* BOT Mem. at 3; *see also id.* at 4–6. But BI did not so argue. Regardless, the Court, in finding an appellate fee award warranted, has not treated such an award as automatic. Instead, the Court has applied the standards of § 1117(a) to the circumstances here. BOT next distinguishes some of BI's case authority, noting that some cited cases did not involve the Lanham Act, did not involve appellate fee applications, or upheld reduced fee awards. *See id.* at 3–6. The Court has considered these precedents and others BOT cites. The Court has been particularly mindful of this authority in assessing the reasonable size of the appellate fee award. None of the cited authority, however, disfavors an appellate fee award here under § 1117(a).

Finally, BOT argues that its appeal was not entirely frivolous, in that the arguments it pursued had, at the least, "some reason to them." *Id.* at 7. That characterization is apt as to some issues pursued on appeal by BOT. As of BOT's opening brief to the Circuit, for example, the legal issue whether the pre-*Octane* or *Octane* standard applies to Lanham Act fee awards remained an open question in the Circuit. (The Circuit's decision in *Sleepy's LLC*, 909 F.3d at 530–31, resolving that question, was issued the following day.) But, on other issues that BOT raised on appeal, reasonable minds could not differ. BOT's contentions that BI had not been the prevailing party in the district court, or that BOT had been in as strong a litigating position as BI

8

prior to the settlement, were risible. Regardless, the standard for a fee award under § 1117(a) of the Lanham Act is not, solely, whether the losing party took frivolous legal positions. It is whether the case presented "exceptional circumstances," measured in light of all factors cognizable under *Octane*. For the reasons above, this case, both in this Court and on appeal, entailed such circumstances.

An award of reasonable fees and costs with respect to BI's successful defense of the decision below awarding it fees and costs under the Lanham Act is, therefore, merited here under § 1117(a).

### B. BI's Reasonable Fees

BOT's arguments directed to the reasonableness of BI's fee request gain more traction. This Court has summarized the standards governing "reasonable fees" in previous BI and BOT litigation:

> "In reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997). A claimant is only to be compensated for "hours reasonably expended on the litigation," and not for "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). If the number of hours stated is disproportionate to the work performed, the Court should reduce the stated hours accordingly. *See id.*; *Seitzman v. Sun Life Assurance Co. of Can.*, 311 F.3d 477, 487 (2d Cir. 2002).

*Benihana Inc. v. Benhihana of Tokyo, LLC*, No. 14 Civ. 792 (PAE), 2016 WL 3647638, at *5 (S.D.N.Y. June 29, 2016).

However, "[t]here is no precise rule or formula" for assessing the reasonableness of fees. *Hensley*, 461 U.S. at 436. Accordingly, the Second Circuit does not require courts to "set forth item-by-item findings concerning what may be countless objections to individual billing items." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam); *see also Marion S. Mishkin Law Office v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014). Instead, a court may "exercise

9

its discretion and use a percentage deduction as a practical means of trimming fat." *Marion S. Mishkin Law Office*, 767 F.3d at 150 (quoting *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006)). This is because "it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." *Amato v. City of Saratoga Springs*, 991 F. Supp. 62, 65 (N.D.N.Y. 1998) (citing *Clarke v. Franke*, 960 F.2d 1146, 1153 (2d Cir. 1992)); *see also Luciano*, 109 F.3d at 117 (crediting district court's reliance on its "first-hand knowledge of [the] litigation and its extensive contact with the parties"); *Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 409–10 (2d Cir. 1987) (rejecting argument that judge may not rely on his or her knowledge of private firm rates).

BI seeks a combined $457,885.50 for its work in connection with BOT's Second Circuit appeal. Of this, $420,732.50 involves work on the briefing and argument of the appeal; and $37,153 involves work on bond, stay, and enforcement litigation work associated with the appeal.

Even without considering BOT's specific challenges to particular aspects of BI's fee request, the Court is constrained to say that the $457,885.50 fee award BI seeks is objectively unreasonable. The Court is familiar with appellate fees incurred in commercial cases before the Circuit. Many appeals in complex commercial cases reasonably justify fees at or even well above the sum BI seeks to obtain from BOT. But under the circumstances here, the sum BI seeks is out of proportion to the demands of its appellate assignment. *See Alveranga v. Winston*, No. 04 Civ. 4356 (ARR) (CLP), 2007 WL 595069, at *6 (E.D.N.Y. 2007) (reducing hours by

40% after considering the parties' arguments and "the Court's familiarity with the work performed in the case and in comparable cases").

Several factors make this an appeal in which fee expenditures on such a scale are not reasonable.

First, the appeal, although involving a significant pretrial record, ultimately concerned a single issue: whether a fee award entered after a settlement reached on the first day of trial was justified under § 1117(a). This entailed, in turn, three inquiries: whether BI was the prevailing party, whether the case involved exceptional circumstances under the *Octane* standard, and whether the fee award fashioned by the Court was reasonable in scale.[1] But the *Fees Decision* that BOT appealed did not implicate, other than as background, any other rulings, for example, with regard to discovery or pretrial motions. And the case did not involve various features that complicate many appeals, *e.g.*, a summary judgment ruling, the conduct of a jury trial, or a lengthy decision following a bench trial embodying findings of fact and conclusions of law.

Second, BI prevailed below. It thus had a single appellee's brief to write on appeal. Its charter there, and at argument, was to defend a detailed, comprehensive district court decision. And BOT's 30-page appellate brief, although contesting the Court's rulings applying § 1117(a) and citing a substantial number of precedents, did not raise fundamentally different questions than those litigated below.

Third, BI's counsel were the same as below (and in the earlier BI / BOT litigations in this Court). They were intimately familiar with the parties' contractual arrangement and litigation

---

[1] By the time BI filed its brief in the Circuit, the Circuit had resolved the legal issue raised in BOT's opening brief of whether the pre-*Octane* or *Octane* standard applied to § 1117(a). BI's appellate brief recognized this. *See* No. 18-2328-cv, Dkt. 46 ("BI App. Br.") (2d Cir. Feb. 25, 2019), at 27 (citing *Sleepy's LLC*, 909 F.3d at 530–31).

11

history. To master the appeal, counsel did not need to master an unfamiliar factual record or unfamiliar legal issues.

To be sure, the Court has no doubt that BI's dedicated and estimable counsel, with whose commitment, judgment, and talent the Court has been impressed across multiple litigations, worked the hours indicated and did so purposefully. And BI was at liberty to pay the fees attributable to the hours that its longtime counsel worked. But, in the Court's judgment, the aggregate fees that BI incurred on the appeal—relative to the discrete nature of the appellate assignment and its middling degree of difficulty—are simply too high to be reasonably shifted, in their entirety or close to it, to losing appellant BOT.

The issue then for the Court is the means by which to determine the reasonable amount of the fees to be shifted.

In prior litigations arising under BI and BOT's license agreement, which provided for an award of reasonable fees and costs to the prevailing party, the Court has also had the duty, upon a motion for fees, to examine closely BI's fee request for reasonableness. In those cases, the size of BI's fee request was not inherently outsized. The Court accordingly took the approach of starting with BI's request, and thereafter reducing it by pruning out problematic time entries and correcting for other deficient billing practices. Through this process of subtraction, the Court derived a reasonable fee award. *See, e.g.*, *Benihana Inc.*, 2016 WL 3647638, at *6–8 (BI sought $171,174.25 in fees and costs; Court awarded $118,860.26); *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7428 (PAE), 2017 WL 6551198, at *4–7 (S.D.N.Y. 2017) (BI sought $1,062,251.34 in fees and costs; Court awarded $634,680.04). The Court took the same approach in the *Fees Decision* whose appellate affirmance by the Circuit is the source of BI's

motion here. BI there had sought $1,212,897.02 in fees and costs, of which the Court awarded $936,665.24. *See Fees Decision*, 2018 WL 3474864, at *12–16.

The Court here has closely reviewed the time records underlying the bills of BI's outside counsel, Stearns Weaver. Consistent with BOT's critique, the Court has found a number of practices warranting a very substantial write-down of the fees paid by BI.

First, work on the appeal was overwhelmingly done by Stearns Weaver partners ("shareholders") with high billing rates. *See* BOT Mem. at 9 & nn.9–12. Such shareholders devoted 598 of the firm's 710 hours on the appeal. And, as demonstrated by BOT, much of the work described by such shareholders on their time records could have been properly performed by persons with lower billing rates. *See LBBW Luxemburg S.A. v. Wells Fargo Secs. LLC*, No. 12 Civ. 7311 (JPO) (KNF), 2016 WL 5812105, at *9 (finding unreasonable the use of "a senior attorney to perform work that could be performed by an attorney with less experience, because [the senior attorney] 'possesses detailed familiarity with the facts and procedural history'"). Activities such as legal research could have been done by junior lawyers. Activities such as filing the notice of appeal, pulling cases and authorities, and pulling materials for the parties' required appellate mediation could have been done by legal assistants.

Second, a review of Stearns Weaver's time records reflects many repeated time entries, with the work performed described in perfunctory manner. These fall into several categories. The time entries associated with certain categories were helpfully extracted by BOT's counsel. Many refer to brief-writing. *See* Schulman Decl., Ex. A (reproducing 63 time entries, largely from shareholders, stating, *inter alia*, "Edit Second Circuit brief," "Revised draft response brief," and "Revised brief"). Others refer to meetings among lawyers to discuss the brief, joint appendix, or strategy. *See id.*, Ex. B (reproducing 28 time entries for meetings, some involving

13

as many as four lawyers). Others refer to the review of case law. *See id.*, Ex. C (reproducing 27 time entries, all from BI's lead counsel, stating, *inter alia*, "Reviewed case authorities," "Reviewed case law," and "reviewed case authorities in preparation for the oral argument"). To be sure, these terse and repetitive descriptions are not inherently problematic. A law firm's client may or may not insist on further elaboration. But, given the number of entries reporting such recurrent activity without accompanying detail explaining the need for such work or the specific content of the work done on particular days, these unrevealing time entries do not comfortably support a fee award on the scale that BI pursues. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 188 F. Supp. 3d 333, 344 (S.D.N.Y. 2016) (collecting cases and reducing fees because of vague billing entries, some of which described work "in mere generalities").

As BOT further chronicles, Stearns Weaver's time records submitted in support of its fee application include an outsized number in which hours appear to have been rounded to a whole number. *See id.*, Ex. D (reproducing 41 such time entries). This practice, too, suggests a degree of imprecision that ill behooves a fee application of the size pursued here. The time records also include 15.1 hours of entries addressed to BI's deficient oral argument statement, in which it initially stated a lack of interest in participating in argument but later changed course. *See id.*, Ex. F. Time spent on this task on BI's behalf is non-compensable by BOT.

Considered as a whole, the above range of problematic billing practices do nothing to dispel the Court's top-line assessment that the $457,885.50 in fees that BI seeks from BOT is facially clearly excessive. And the scale of unrevealing time entries discourages the Court from using the practice it has used in past cases, in which it has taken, as a starting point for its fee calculation, the bills paid by BI to its outside counsel, and from there made subtractions to reflect

14

non-compensable time or billing deficiencies. Although the Court could undertake that task, and would do so if necessary, the Court's assessment is that such an approach would not produce a particularly enlightening outcome. That is because the scale of opaque billing entries would make it hard to gauge the proper discount. An assessment reached by means of percentage discounts off of BI's bills could easily yield an outcome that materially under- or over-charged BOT for BI's reasonable legal fees.

The Court instead—drawing upon its own experience and familiarity with federal appellate work, including before the Second Circuit—has closely examined the nature of BI's appellate assignment and the volume of work necessarily performed, as reflected in BI's appellate brief and oral argument. The Court's goal has been to place a conservative value of the work BI necessarily performed in defending this Court's fee award on appeal.

To that end, BI's 48-page brief evidently reflects an impressive investment of time by BI's counsel. It bespeaks a thorough effort to parse a considerable body of case law in cases involving fee awards, under the Lanham Act and otherwise. BI's appellate brief further reflects a careful effort to master, and distinguish, the significant body of case law, much of it inapposite, on which BOT relied on appeal. It also represents detailed attention to the record and application of the governing legal standards to it. In all these respects, BI's brief is consistent with its counsel's narrative account of Stearns Weaver's extensive work on this filing. *See* Fein Decl. ¶¶ 7–11. BI's oral argument, too, as evidenced by audiotape of that argument, reflected ample preparation, consistent with counsel's narrative account. *Id*. ¶ 12.

In the end, the Court is comfortable assessing the reasonable value of the legal work performed by BI's outside counsel on the appeal and associated tasks as, conservatively, $125,000. Based on its familiarity with Second Circuit practice and billing practices in

commercial and intellectual property cases involving substantial corporate litigants along the lines of BI and BOT, and based on its assessment of the hours necessarily worked on this appeal, the Court finds it exceptionally unlikely that a professional law firm—billing leanly, drawing on its familiarity with the litigation, using junior staff where viable, and performing necessary work only—would bill and be paid by its corporate client less than $125,000. To be sure, many reasonable observers would value appreciably higher the work BI's counsel performed on this appeal. Had BI's time records been usable for this purpose, the Court would have been open to a significantly higher valuation. But under the circumstances, where counsel's timesheets are of limited assistance, the Court's charter must be to err on the side of conservatism, so as to assure that the fee award to BOT is not excessive. The Court's $125,000 valuation achieves this.

### C. BI's Reasonable Costs

For avoidance of doubt, the above $125,000 valuation relates only to the component of an award compensating BI for its legal fees. BI is also entitled to compensation for its reasonably incurred out-of-pocket costs associated with the appeal. Although stating that it sought an award of such costs on the appeal, BI has not itemized or even aggregated such costs in its application to this Court, even though it surely incurred some (*e.g.*, counsel's travel to and from New York for argument, and the printing of BI's appellate brief).

The Court will permit BI, within one week of this decision, to submit a declaration of counsel itemizing and documenting such costs. The Court will then determine the proper amount of costs to include in the award. Such costs, however, are to be strictly limited to those costs incurred in connection with the Second Circuit appeal itself, not to ancillary activities such as those relating to a bond or collection efforts.

16

## CONCLUSION

For the reasons stated above, the Court awards Benihana, Inc., $125,000 in reasonable attorneys' fees, in connection with its work opposing BOT's appeal to the Second Circuit of the Court's July 25, 2018 *Fees Decision*. A separate order will issue as to the amount of a reasonable award of costs, following BI's submission on this point, described above, which is due in one week.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: January 8, 2020
New York, New York